## WILDER, GOVERNOR OF VIRGINIA, ET AL. *v.* VIRGINIA HOSPITAL ASSOCIATION

No. 88–2043.   Argued January 9, 1990—Decided June 14, 1990

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, BLACKMUN, and STEVENS, JJ., joined. REHNQUIST, C. J., filed a dissenting opinion, in which O'CONNOR, SCALIA, and KENNEDY, JJ., joined, *post*, p. 524.

*R. Claire Guthrie*, Deputy Attorney General of Virginia, argued the cause for petitioners. With her on the briefs were *Mary Sue Terry*, Attorney General, *Roger L. Chaffe*, Senior Assistant Attorney General, and *Pamela M. Reed* and *Virginia R. Manhard*, Assistant Attorneys General.

*Deputy Solicitor General Roberts* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr*, *Assistant Attorney General Gerson*, *Lawrence S. Robbins*, *Anthony J. Stein-meyer*, and *Irene M. Solet*.

*Walter Dellinger* argued the cause for respondent. With him on the brief were *Martin A. Donlan, Jr.*, and *Judith B. Henry*.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Connecticut et al. by *Clarine Nardi Riddle*, Attorney General of Connecticut, and *Richard J. Lynch*, *Arnold I. Menchel*, and *Kenneth A. Graham*, Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Don Siegelman* of Alabama, *Douglas B. Baily* of Alaska, *Robert K. Corbin* of Arizona, *John K. Van de Kamp* of California, *Duane Woodard* of Colorado, *Charles M. Oberly III* of Delaware, *Robert A. Butterworth* of Florida, *Michael J. Bowers* of Georgia, *Warren Price III* of Hawaii, *Jim Jones* of Idaho, *Neil F. Hartigan* of Illinois, *Linley E. Pearson* of Indiana, *Thomas J. Miller* of Iowa, *Robert T. Stephan* of Kansas, *Frederic J. Cowan* of Kentucky, *William J. Guste, Jr.*, of Louisiana, *James E. Tierney* of Maine, *J. Joseph Curran, Jr.*, of Maryland, *James*

JUSTICE BRENNAN delivered the opinion of the Court.

This case requires us to determine whether a health care provider may bring an action under 42 U. S. C. § 1983 (1982 ed.)[1] to challenge the method by which a State reimburses health care providers under the Medicaid Act (Act), 79 Stat. 343, as amended, 42 U. S. C. § 1396 *et seq.* (1982 ed. and Supp. V). More specifically, the question presented is whether the Boren Amendment to the Act, which requires reimbursement according to rates that a "State finds, and makes assurances satisfactory to the Secretary, are rea-

*M. Shannon* of Massachusetts, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *William L. Webster* of Missouri, *Marc Racicot* of Montana, *Brian McKay* of Nevada, *John P. Arnold* of New Hampshire, *Peter N. Perretti, Jr.,* of New Jersey, *Hal Stratton* of New Mexico, *Robert Abrams* of New York, *Lacy H. Thornburg* of North Carolina, *Nicholas J. Spaeth* of North Dakota, *Anthony J. Celebrezze, Jr.,* of Ohio, *Robert H. Henry* of Oklahoma, *David Frohnmayer* of Oregon, *Ernest D. Preate, Jr.,* of Pennsylvania, *James E. O'Neil* of Rhode Island, *T. Travis Medlock* of South Carolina, *Roger Tellinghuisen* of South Dakota, *Charles W. Burson* of Tennessee, *Jim Mattox* of Texas, *Paul Van Dam* of Utah, *Jeffrey L. Amestoy* of Vermont, *Kenneth Eikenberry* of Washington, *Charles G. Brown* of West Virginia, and *Joseph B. Meyer* of Wyoming; and for the National Governors' Association et al. by *Benna Ruth Solomon.*

Briefs of *amici curiae* urging affirmance were filed for the American Health Care Association et al. by *Thomas C. Fox, Joel M. Hamme, Eugene Tillman, W. Thomas McGough, Jr., Rex E. Lee,* and *Carter G. Phillips;* for the California Association of Hospitals et al. by *Robert A. Klein, Mark S. Windisch,* and *C. Darryl Cordero;* and for Temple University by *Matthew M. Strickler.*

*Robert D. Newman* filed a brief for the Gray Panthers Advocacy Committee et al. as *amici curiae.*

[1] Section 1983 provides in relevant part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

sonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities," 42 U. S. C. § 1396a(a)(13)(A) (1982 ed., Supp. V), is enforceable in an action pursuant to § 1983.

## I

## A

Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals. § 1396. Although participation in the program is voluntary, participating States must comply with certain requirements imposed by the Act and regulations promulgated by the Secretary of Health and Human Services (Secretary). To qualify for federal assistance, a State must submit to the Secretary and have approved a "plan for medical assistance," § 1396a(a), that contains a comprehensive statement describing the nature and scope of the State's Medicaid program. 42 CFR § 430.10 (1989). The state plan is required to establish, among other things, a scheme for reimbursing health care providers for the medical services provided to needy individuals.

Section 1902(a)(13) of the Act sets out the requirements for reimbursement of health care providers. As amended in 1980 (Boren Amendment),[2] the section provides that

"a State plan for medical assistance must—

.          .          .          .          .

"provide . . . for payment . . . of the hospital services, nursing facility services, and services in an intermediate

---

[2] In 1980, Congress enacted the Boren Amendment which changed the standard for reimbursement of nursing and intermediate care facilities. Pub. L. 96–499, § 962(a), 94 Stat. 2650. The following year Congress extended the Boren Amendment's standard for reimbursement to hospitals. Pub. L. 97–35, § 2173, 95 Stat. 808. Since then the reimbursement standard has been applied to payments made to intermediate care facilities for the mentally retarded. Pub. L. 100–203, § 4211(h)(2)(A), 101 Stat. 1330–205.

care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State . . .) *which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities* in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access . . . to inpatient hospital services of adequate quality." 42 U. S. C. § 1396a(a) (13)(A) (1982 ed., Supp. V) (emphasis added).

The Commonwealth of Virginia's State Plan for Medical Assistance was approved by the Secretary in 1982 and again in 1986 after an amendment was made. Complaint, ¶ 11, App. 11. Under the plan, health care providers are reimbursed for services according to a prospective formula—that is, reimbursement rates for various types of medical services and procedures are fixed in advance. Specifically, providers are divided into "peer groups" based on their size and location and reimbursed according to a formula based on the median cost of medical care for that peer group.

In 1986, respondent Virginia Hospital Association (VHA), a nonprofit corporation composed of both public and private hospitals operating in Virginia, *id.*, at ¶ 3, App. 4–5, filed suit in the United States District Court for the Eastern District of Virginia against several state officials including the Governor, the Secretary of Human Resources, and the members of the State Department of Medical Assistance Services (the state agency that administers the Virginia Medicaid system). Respondent contends that Virginia's plan for reimbursement violates the Act because the "rates are not reasonable and adequate to meet the economically and efficiently incurred cost of providing care to Medicaid patients in hospitals and do not assure access to inpatient care." *Id.*, at ¶ 1, App. 4; see also

*id.*, at ¶ 17, App. 13 ("The per diem reimbursement rates . . . have not reasonably nor adequately met the costs incurred by efficiently and economically operated hospitals in providing care and services in conformity with applicable state and federal laws, regulations, and quality and safety standards").[3] Respondent seeks declaratory and injunctive relief including an order requiring petitioners to promulgate a new state plan providing new rates and, in the interim, to reimburse Medicaid providers at rates commensurate with payments under the Medicare program. *Id.*, at ¶¶ 34–39, App. 20–22.

Petitioners filed a motion to dismiss or in the alternative a motion for summary judgment on the ground that 42 U. S. C. § 1983 (1982 ed.) does not afford respondent a cause of action to challenge the Commonwealth's compliance with the Medicaid Act. 2 Record, Exh. 36, p. 1.[4] The District

---

[3] Virginia's current formula for reimbursement rates takes the median cost of care for each peer group as computed for 1982 and adjusts the costs annually to account for inflation. The figures for the median cost of care in 1982 were calculated by determining the per diem median cost of care for a Medicaid patient in the year 1981 and then adjusting for inflation through the use of the Consumer Price Index (CPI). Until 1986, to determine the annual reimbursment rates, the 1982 baseline figures were adjusted by the CPI. In 1986, however, the plan was amended so that these baseline figures are adjusted by an inflation index that is tied to medical care costs. App. 24–26.

Respondent argues that this method of calculating the payment rates is not tied to the costs incurred by an efficient and economical hospital. More specifically, respondent challenges: (1) the method of computing the baseline median costs for 1982; (2) the use of the CPI rather than an index tied to medical care costs to adjust the rates in the years 1982–1986; and (3) the way in which the medical care cost index was used after 1986. Complaint, ¶¶ 20–26, App. 14–16. In addition, respondent contends that the appeals procedure established by the state plan is inadequate under the Act in part because it excludes challenges to the principles of reimbursement. *Id.*, at ¶ 32, App. 19.

[4] The District Court initially granted petitioners' motion to dismiss on grounds of collateral estoppel. 1 Record, Exhs. 20 and 21. The Court of Appeals reversed. *Virginia Hospital Assn.* v. *Baliles*, 830 F. 2d 1308 (CA4 1987). On remand petitioners raised numerous challenges to the jus-

Court denied the motion. App. to Pet. for Cert. D–4—D–6. The Court of Appeals for the Fourth Circuit affirmed, concluding that health care providers may sue state officials for declaratory and injunctive relief under § 1983 to ensure compliance with the Act. More specifically, the court held that the language and legislative history of the Boren Amendment demonstrate that it creates "enforceable rights" and that Congress did not intend to foreclose a private remedy for the enforcement of those rights. *Virginia Hospital Assn.* v. *Baliles*, 868 F. 2d 653, 656–660 (1989). We granted certiorari. 493 U. S. 808 (1989).[5]

## B

In order to determine whether the Boren Amendment is enforceable under § 1983, it is useful first to consider the history of the reimbursement provision. When enacted in 1965, the Act required States to provide reimbursement for the "reasonable cost" of hospital services actually provided, measured according to standards adopted by the Secretary. Pub. L. 89–97, § 1902(13)(B), 79 Stat. 346. Congress became concerned, however, that the Secretary wielded too much control over reimbursement rates. See H. R. Rep. No. 92–231, p. 100 (1971). Congress therefore amended the Act in 1972 to give States more flexibility to develop methods and standards for reimbursement, but Congress retained the ultimate requirement that the rates reimburse the "reasonable cost" of the services provided. The new law required States to pay "the reasonable cost of inpatient hospital services . . . as determined in accordance with methods and standards

---

ticiability of the lawsuit, including an argument based on the Eleventh Amendment. The Court of Appeals rejected this argument on the ground that the suit seeks only prospective injunctive relief against state officials. *Virginia Hospital Assn.* v. *Baliles*, 868 F. 2d 653, 662 (CA4 1989).

[5] We previously granted certiorari to decide this issue in *Coos Bay Care Center* v. *Oregon Dept. of Human Resources*, 803 F. 2d 1060 (CA9 1986), vacated as moot, 484 U. S. 806 (1987).

which shall be developed by the State and reviewed and approved by the Secretary." Pub. L. 92–603, § 232(a), 86 Stat. 1410–1411.

In response to rapidly rising Medicaid costs, Congress in 1981 extended the Boren Amendment to hospitals, as part of the Omnibus Budget Reconciliation Act of 1981, Pub. L. 97–35, 95 Stat. 808.[6] Congress blamed mounting Medicaid costs on the complexity and rigidity of the Secretary's reimbursement regulations. See H. R. Rep. No. 97–158, Vol. 2, pp. 292–293 (1981); S. Rep. No. 96–471, pp. 28–29 (1979). Although the previous version of the Act in theory afforded States some degree of flexibility to adopt their own methods for determining reimbursement rates, Congress found that, in fact, the regulations promulgated by the Secretary had essentially forced States to adopt Medicaid rates based on Medicare "reasonable cost" principles. Congress "recognize[d] the inflationary nature of the [then] current cost reimbursement system and intend[ed] to give States greater latitude in developing and implementing alternative reimbursement methodologies that promote the efficient and economical delivery of such services." H. R. Rep. No. 97–158, Vol. 2, *supra*, at 293. The amendment "delete[d] the current provision requiring States to reimburse hospitals on a reasonable cost basis [and] substitute[d] a provision requiring States to reimburse hospitals at rates . . . that are reasonable and adequate to meet the cost which must be incurred by efficiently and economically operated facilities in order to meet applicable laws and quality and safety standards." S. Rep. No. 97–139, p. 478 (1981). Thus, while Congress affirmed its desire that state reimbursement rates be "reasonable," it afforded States greater flexibility in calculating those "reasonable rates." For example, Congress explained that States would be free to establish statewide or classwide rates, establish rates based on a prospective

---

[6] See n. 2, *supra*.

cost,[7] or include incentive provisions to encourage efficient operation. See H. R. Rep. No. 97–158, Vol. 2, *supra*, at 292–293; S. Rep. No. 96–471, *supra*, at 29. Flexibility was ensured by limiting the oversight role of the Secretary. See S. Rep. No. 97–139, *supra*, at 478. Thus, the Boren Amendment provides that a State must reimburse providers according to rates that it "finds, and makes assurances satisfactory to the Secretary," are "reasonable and adequate" to meet the costs of "efficiently and economically operated facilities." The State must also assure the Secretary that individuals have "reasonable access" to facilities of "adequate quality."

The Act does not define these terms, and the Secretary has declined to adopt a national definition, concluding that States should determine the factors to be considered in determining what rates are "reasonable and adequate" to meet the costs of "efficiently and economically operated facilit[ies]." See 48 Fed. Reg. 56049 (1983). The regulations require a State to make a finding at least annually that its rates are "reasonable and adequate," see 42 CFR § 447.253(b)(1) (1989), though the State is required to submit assurances to that effect to the Secretary only when it makes a change in its reimbursement rates. See § 447.253(a); 48 Fed. Reg. 56047 (1983). According to the Secretary, the Boren Amendment "places the responsibility for the development of reasonable and adequate payment rates with the States." *Id.*, at 56050. Thus, he reviews only the reasonableness of the assurances provided by a State and not the State's findings themselves.

---

[7] Before the passage of the Boren Amendment, state plans provided for reimbursement on a retrospective basis; that is, health care providers were reimbursed according to the reasonable cost of the services *actually* provided. Since the passage of the Boren Amendment in 1981, however, most States have adopted plans that are prospective in nature, whereby providers are paid in advance and payments are calculated according to the State's formula for what such care *should* cost. The Virginia plan is a typical prospective plan.

See 42 CFR § 447.256(2) (1989). The Secretary's review focuses "on the assurances which attest to the fact that States' findings do indeed indicate that the payment rates are reasonable" and judges "whether the assurances are satisfactory." 48 Fed. Reg. 56051 (1983). Therefore the Secretary does not require States to submit the findings themselves or the underlying data.[8]

## II

Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. In *Maine* v. *Thiboutot*, 448 U. S. 1, 4 (1980), we held that § 1983 provides a cause of action for violations of federal statutes as well as the Constitution. We have recognized two exceptions to this rule. A plaintiff alleging a violation of a federal statute will be permitted to sue under § 1983 unless (1) "the statute [does] not create enforceable rights, privileges, or immunities within the meaning of § 1983," or (2) "Congress has foreclosed such enforcement of the statute in the enactment itself." *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418, 423 (1987).[9] Petitioners argue first that the

---

[8] The state Medicaid agency must submit the following information with the assurances: (1) the amount of the estimated average proposed payment rate for each type of provider, (2) the amount by which the rate is increased or decreased in relation to the preceding year, and (3) an estimate of the short-term, and to the extent feasible, long-term, effect the new rate will have on the availability of services, the type of care furnished, the extent of provider participation, and the degree to which costs are covered in hospitals that serve a disproportionate number of low-income patients. 42 CFR § 447.255 (1989). The Secretary may, however, request a State to provide additional background information if he believes it is necessary for a complete review of the State's assurances. 48 Fed. Reg. 56050 (1983).

[9] This is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute. See *Cort* v. *Ash*, 422 U. S. 66 (1975). In implied right of action cases, we employ the four-factor *Cort* test to determine "whether Congress intended to create the private remedy asserted" for the violation of statutory rights. See *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11, 15–16 (1979);

Boren Amendment does not create any "enforceable rights" and second, that Congress has foreclosed enforcement of the Act under § 1983. We address these contentions in turn.

A

"Section 1983 speaks in terms of '*rights*, privileges, or immunities,' not violations of federal law." *Golden State Transit Corp.* v. *Los Angeles*, 493 U. S. 103, 106 (1989) (emphasis added). We must therefore determine whether the Boren Amendment creates a "federal right" that is enforceable under § 1983. Such an inquiry turns on whether "the provision in question was intend[ed] to benefit the putative plaintiff." *Ibid.* (citations and internal quotations omitted). If so, the provision creates an enforceable right unless it reflects merely a "congressional preference" for a certain kind of conduct rather than a binding obligation on the governmental unit, *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 19 (1981), or unless the interest the plaintiff asserts is "'too vague and amorphous'" such that it is "'beyond the competence of the judiciary to enforce.'" *Golden State, supra*, at 106 (quoting *Wright, supra*, at 431–432). Under this test, we conclude that the Act creates a right enforceable by health care providers under § 1983 to

*Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 575–576 (1979). The test reflects a concern, grounded in separation of powers, that Congress rather than the courts controls the availability of remedies for violations of statutes. See, *e. g.*, *Thompson* v. *Thompson*, 484 U. S. 174, 191–192 (1988) (SCALIA, J., concurring in judgment); *Cannon* v. *University of Chicago*, 441 U. S. 677, 742–749 (1979) (Powell, J., dissenting). Because § 1983 provides an "alternative source of *express* congressional authorization of private suits," *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 19 (1981), these separation-of-powers concerns are not present in a § 1983 case. Consistent with this view, we recognize an exception to the general rule that § 1983 provides a remedy for violation of federal statutory rights only when Congress has affirmatively withdrawn the remedy. See *Golden State Transit Corp.* v. *Los Angeles*, 493 U. S. 103, 106–107 (1989); *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418, 423–424 (1987).

the adoption of reimbursement rates that are reasonable and adequate to meet the costs of an efficiently and economically operated facility that provides care to Medicaid patients. The right is not merely a procedural one that rates be accompanied by findings and assurances (however perfunctory) of reasonableness and adequacy; rather the Act provides a substantive right to reasonable and adequate rates as well.

There can be little doubt that health care providers are the intended beneficiaries of the Boren Amendment. The provision establishes a system for reimbursement of providers and is phrased in terms benefiting health care providers: It requires a state plan to provide for "payment . . . of the *hospital* services, *nursing facility* services, and services in an *intermediate care facility* for the mentally retarded provided under the plan." 42 U. S. C. § 1396a(a)(13)(A) (1982 ed., Supp. V) (emphasis added). See *Wright, supra,* at 430. The question in this case is whether the Boren Amendment imposes a "binding obligation" on the States that gives rise to enforceable rights.

In *Pennhurst, supra,* the Court held that § 111 of the Developmentally Disabled Assistance and Bill of Rights Act, 42 U. S. C. § 6010 (1976 ed. and Supp. III), did not create rights enforceable under § 1983. Section 6010, the "bill of rights" provision, declared that Congress had made certain "findings respecting the rights of persons with developmental disabilities," namely, that such persons have a right to "appropriate treatment'" in the least restrictive environment and that federal and state governments have an obligation to ensure that institutions failing to provide "appropriate treatment" do not receive federal funds. 451 U. S., at 13. The Court concluded that the context of the entire statute and its legislative history revealed that Congress intended neither to create new substantive rights nor to require States to recognize such rights; instead, Congress intended only to indicate a preference for "appropriate treatment." *Id.,* at 22–24. The Court examined the language of the provision and deter-

mined that a general statement of "findings" was "too thin a reed to support" a creation of rights and obligations. *Id.*, at 19. Moreover, since neither the statute nor the corresponding regulations made compliance with the provision a condition of receipt of federal funding, the Court reasoned that "the provisions of § 6010 were intended to be hortatory, not mandatory." *Id.*, at 24. The Court refused to infer congressional intent to condition federal funding on compliance because "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds." *Ibid.*[10]

More recently, in *Wright,* however, we found that the Brooke Amendment to the Housing Act of 1937, 42 U. S. C. § 1437a (1982 ed. and Supp. III), and its implementing regulations did create rights enforceable under § 1983. The Brooke Amendment limits the amount of rent a public housing tenant can be charged, and the regulations adopted pursuant to the statute require inclusion of a "reasonable" allowance for utilities in the rent. 479 U. S., at 420. We reasoned that both the statute and the regulations were "mandatory limitation[s] focusing on the individual family and its income." *Id.*, at 430. In addition, we rejected the argument that the provision for a reasonable utility allotment was too vague to create an enforceable right. Because the regulations set out guidelines for the housing authorities to follow in determining the utility allowance, the right was "sufficiently specific and defi-

---

[10] That Congress granted the States only $1.6 million, "a sum woefully inadequate to meet the enormous financial burden of providing 'appropriate' treatment in the 'least restrictive'" alternative also supported the Court's conclusion that Congress had a limited purpose in mind when it enacted § 6010. 451 U. S., at 24. By contrast, under the Medicaid program, the Federal Government provides funds to cover between 50% and 83% of the cost of patient care. See 42 U. S. C. § 1396d(b) (1982 ed., Supp. V). In 1988, the federal contribution to the Medicaid program totaled approximately $29 billion. Brief for United States as *Amicus Curiae* 2.

nite to qualify as [an] enforceable righ[t] under *Pennhurst* and § 1983 [and was] not . . . beyond the competence of the judiciary to enforce." *Id.*, at 432.

In light of *Pennhurst* and *Wright*, we conclude that the Boren Amendment imposes a binding obligation on States participating in the Medicaid program to adopt reasonable and adequate rates and that this obligation is enforceable under § 1983 by health care providers. The Boren Amendment is cast in mandatory rather than precatory terms: The state plan *"must"* "provide for payment . . . of hospital[s]" according to rates the State finds are reasonable and adequate. 42 U. S. C. § 1396a(a)(13)(A) (1982 ed., Supp. V) (emphasis added). Moreover, provision of federal funds is expressly conditioned on compliance with the amendment and the Secretary is authorized to withhold funds for noncompliance with this provision. 42 U. S. C. § 1396c (1982 ed.). The Secretary has expressed his intention to withhold funds if the state plan does not comply with the statute or if there is "noncompliance in practice." See 42 CFR § 430.35 (1989) ("A question of noncompliance in practice may arise from the State's failure to actually comply with a Federal requirement, regardless of whether the plan itself complies with that requirement"). "The [Boren Amendment's] language succinctly sets forth a congressional command, which is wholly uncharacteristic of a mere suggestion or 'nudge.'" *West Virginia University Hospitals, Inc.* v. *Casey*, 885 F. 2d 11, 20 (CA3 1989) (quoting *Pennhurst*, 451 U. S., at 19), cert. granted, 494 U. S. 1003 (1990).

Petitioners concede that the Boren Amendment requires a State to provide *some* level of reimbursement to health care providers and that a cause of action would lie under § 1983 if a State failed to adopt any reimbursement provision whatsoever. Tr. of Oral Arg. 12. Petitioners also concede, as they must, that a State is required to find that its rates are reasonable and adequate and to make assurances to that effect to

the Secretary.   Reply Brief for Petitioners 3.[11]   The dissent, although acknowledging that the State has these obligations, apparently would hold that the only right enforceable under § 1983 is the right to compel compliance with these bare procedural requirements.   See *post*, at 527–528.   We think the amendment cannot be so limited.   Any argument that the requirements of findings and assurances are procedural requirements only and do not require the State to adopt rates that are actually reasonable and adequate is nothing more than an argument that the State's findings and assurances need not be correct.

---

[11] The United States, as *amicus curiae*, argues that the statute requires only that a State provide assurances to the Secretary that its rates comply with the statute and that assurances do not give rise to enforceable rights. Brief for United States as *Amicus Curiae* 16 ("By its terms, therefore, [the Boren Amendment] vests ratemaking discretion in the States, subject only to the condition that they make 'assurances' satisfactory to the Secretary").   This interpretation ignores the language of the statute that requires a State to *find* that its rates are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities" and to assure that eligible individuals have "reasonable access" to services.   See also 42 CFR § 447.253(b) (1989); 48 Fed. Reg. 56051 (1983) ("The statute requires that the States make a finding that their payment rates are reasonable and adequate to meet the costs of efficiently and economically operated facilities").   The requirement that a State make such a finding is a necessary prerequisite to the subsequent requirement that the State provide "assurances" to the Secretary.   That the requirements are separate obligations is apparent from the Secretary's regulations.   A State must make findings at least annually, but does not need to make assurances unless the state plan is amended.   42 CFR §§ 447.253(a), (b) (1989).   Moreover, the Secretary's interpretation of his role under the statute—that he will review the reasonableness of the assurances presented by a State rather than the findings themselves—is based entirely on his understanding that a State has the responsibility to *find* that its rates are adequate before making assurances to the Secretary.   See 48 Fed. Reg. 56050 (1983) ("Because of the explicit statutory responsibility of the State agency to make its findings that the method and standards result in reasonable and adequate payment rates, we doubt that requiring further detailed reporting would add substantially to our evaluation of States' assurances").

We reject that argument because it would render the statutory requirements of findings and assurances, and thus the entire reimbursement provision, essentially meaningless. It would make little sense for Congress to require a State to make findings without requiring those findings to be correct. In addition, there would be no reason to require a State to submit assurances to the Secretary if the statute did not require the State's findings to be reviewable in some manner by the Secretary. We decline to adopt an interpretation of the Boren Amendment that would render it a dead letter. See *Rosado* v. *Wyman*, 397 U. S. 397, 412–415 (1970); see also 2A C. Sands, Sutherland on Statutory Construction § 45.12 (4th ed. 1984).

Petitioners acknowledge that a State may not make, or submit assurances based on, a patently false finding, see Tr. of Oral Arg. 7, but insist that Congress left it to the Secretary, and not the federal courts, to ensure that the State's rates are not based on such false findings.[12] To the extent that this argument bears on the question whether the Boren Amendment creates enforceable rights (as opposed to whether Congress intended to foreclose private enforcement of the statute pursuant to § 1983, see *infra*, at 520–523), it supports the conclusion that the provision does create enforceable rights. If the Secretary is entitled to reject a state plan upon concluding that a State's assurances of compliance are unsatisfactory, see *supra*, at 512, a State is on notice that it cannot adopt any rates it chooses and that the requirement that it make "findings" is not a mere formality. Cf. *Pennhurst*, *supra*, at 24. Rather, the only plausible interpre-

---

[12] Petitioners suggest that health care providers might be able to bring a challenge against the Secretary's decision to approve a plan under the judicial review provisions of the Administrative Procedure Act (APA), 5 U. S. C. §§ 701–706. The United States, however, argues that there would be no remedy under the APA because the decision to accept a States' assurances is entrusted to the agency's discretion. See Tr. of Oral Arg. 18–19. We need not address this dispute, however, because it is irrelevant to the question whether the Boren Amendment creates rights enforceable against States under § 1983.

tation of the amendment is that by requiring a State to *find* that its rates are reasonable and adequate, the statute imposes the concomitant obligation to adopt reasonable and adequate rates.

Any doubt that Congress intended to require States to adopt rates that actually are reasonable and adequate is quickly dispelled by a review of the legislative history of the Boren Amendment. The primary objective of the amendment was to free States from reimbursement according to Medicare "reasonable cost" principles as had been required by prior regulation. The amendment "delete[d] the . . . provision requiring States to reimburse hospitals on a reasonable cost basis. It substitute[d] a provision *requiring States to reimburse hospitals at rates . . . that are reasonable and adequate* to meet the cost which must be incurred by efficiently and economically operated facilities in order to meet applicable laws and quality and safety standards." S. Rep. No. 97–139, at 478 (emphasis added). In passing the Boren Amendment, Congress sought to decentralize the method for determining rates, but not to eliminate a State's fundamental obligation to pay reasonable rates. See S. Rep. No. 96–471, at 29 (flexibility given to States "not intended to encourage arbitrary reductions in payment that would adversely affect the quality of care"). In other words, while Congress gave States leeway in adopting a method of computing rates—they can choose between retrospective and prospective rate-setting methodologies, for example—Congress retained the underlying requirement of "reasonable and adequate" rates.[13]

---

[13] The House and Senate Reports are replete with indications that Congress intended that States actually adopt rates that are "reasonable and adequate." The Conference Committee Report explains that "the conferees intend that State hospital reimbursement policies should meet the costs that must be incurred by efficiently-administered hospitals in providing covered care and services to medicaid eligibles as well as the costs required to provide care in conformity with State and Federal requirements." H. R. Conf. Rep. No. 97–208, p. 962 (1981); see S. Rep. No. 97–139, p. 478 (1981) (amendment requires "States to reimburse hospitals at rates . . . that are reasonable and adequate to meet the costs which must be in-

By reducing the Secretary's role in establishing the rates, Congress intended only that the primary responsibility for developing rates be transferred to the States; the Secretary was still to ensure compliance with the provision. See S. Rep. No. 97–139, at 478 ("The committee expects that the Secretary will keep regulatory and other requirements to the *minimum necessary to assure proper accountability*, and not to overburden the States and facilities with unnecessary and burdensome paperwork requirements") (emphasis added); H. R. Conf. Rep. No. 96–1479, p. 154 (1980) ("[T]he Secretary retains final authority to review the rates and to disapprove [them] if they do not meet the requirements of the statute"). If petitioners were right that state findings were not required to be correct, there would be little point in requiring the Secretary to review the State's assurances.

Moreover, it is clear that prior to the passage of the Boren Amendment, Congress intended that health care providers be able to sue in federal court for injunctive relief to ensure that they were reimbursed according to reasonable rates. During the 1970's, provider suits in the federal courts were commonplace.[14] In addition, in response to several States

---

curred by efficiently and economically operated facilities"); H. R. Rep. No. 97–158, Vol. 2, pp. 293–294 (1981) ("In permitting States greater flexibility in reimbursement system design, the Committee intends the States to ensure that such alternative systems provide fair and adequate compensation for services to Medicaid beneficiaries. . . . The Committee believes that hospitals should be paid for the cost of their care to Medicaid patients in the most economical manner"); see also Medicaid and Medicare Amendments: Hearings on H. R. 4000 before the Subcommittee on Health and the Environment of the House Committee on Interstate and Foreign Commerce, 96th Cong., 1st Sess., 845 (1979) (statement of Sen. Boren) (amendment "places responsibility squarely on the States to establish adequate payments"); 126 Cong. Rec. 17885 (1980) (the "amendment . . . achieves the present law's objective of assuring high-quality care" and "differs from the present law with respect to the methods States may employ in determining reasonable and adequate rates") (colloquy between Sen. Pryor and Sen. Boren).

[14] See, *e. g., Alabama Nursing Home Assn.* v. *Harris,* 617 F. 2d 388, 395–396 (CA5 1980); *California Hospital Assn.* v. *Obledo,* 602 F. 2d 1357,

freezing their Medicaid payments to health care providers, Congress amended the Act in 1975 to require States to waive any Eleventh Amendment immunity from suit for violations of the Act. See H. R. Rep. No. 94–1122, p. 4 (1976); see also 121 Cong. Rec. 42259 (1975) (remarks of Sen. Taft). Congress believed the waiver necessary because the existing means of enforcement—noncompliance procedures instituted by the Secretary or suits for injunctive relief by health care providers—were insufficient to deal with the problem of outright noncompliance because they included no compensation for past underpayments. See H. R. Rep. No. 94–1112, *supra*, at 4. The amendment required the Secretary to withhold 10% of federal Medicaid funds from any State that had not executed a waiver of its immunity by March 31, 1976. Pub. L. 94–182, § 111, 89 Stat. 1054. The provision generated a great deal of opposition from the States and was repealed in the next session of Congress. Pub. L. 94–552, 90 Stat. 2540; see H. R. Rep. No. 94–1122, *supra*, at 4; S. Rep. No. 94–1240, pp. 3–4 (1976); 122 Cong. Rec. 13492 (1976) (remarks of Rep. Rogers). But Congress explained that it did not intend the repeal to "be construed as in any way contravening or constraining the rights of the providers of Medicaid services, the State Medicaid agencies, or the Department to seek prospective, injunctive relief in a federal or state judicial forum. Neither should the repeal of [the waiver section] be interpreted as placing constraints on the rights of the par-

---

1363 (CA9 1979); *Minnesota Assn. of Health Care Facilities* v. *Minnesota Dept. of Public Welfare*, 602 F. 2d 150, 154 (CA8 1979); *Hospital Assn. of New York State, Inc.* v. *Toia*, 577 F. 2d 790 (CA2 1978); *Massachusetts General Hospital* v. *Weiner*, 569 F. 2d 1156, 1157–1158 (CA1 1978); *St. Mary's Hospital of East St. Louis, Inc.* v. *Ogilvie*, 496 F. 2d 1324, 1326–1328 (CA7 1974); *Catholic Medical Center of Brooklyn and Queens, Inc., Div. of St. Mary's Hospital* v. *Rockefeller*, 430 F. 2d 1297, 1298 (CA2), app. dism'd, 400 U. S. 931 (1970). Cf. *National Union of Hospital and Health Care Employees, RWDSU, AFL–CIO* v. *Carey*, 557 F. 2d 278, 280–281 (CA2 1977) (although providers may sue, union representing employees of provider may not sue).

ties involved to seek such prospective, injunctive relief." S. Rep. No. 94–1240, at 4.[15]

This experience demonstrates clearly that Congress and the States both understood the Act to grant health care providers enforceable rights both before and after repeal of the ill-fated waiver requirement.[16] Given this background, it is implausible to conclude that by substituting the requirements

---

[15] See, *e. g.*, H. R. Rep. No. 94–1122, p. 7 (1976) ("[P]roviders can continue, of course, to institute suit for injunctive relief in State or Federal courts, as necessary") (letter from Department of Health, Education and Welfare); State Compliance with Federal Medicaid Requirements: Hearings before the Subcommittee on Health of the Senate Committee on Finance, 94th Cong., 2d Sess., 3 (1976) (providers' recourse, without amendment, includes "injunctive relief against State officials") (remarks of Assistant Secretary Kurzman); 122 Cong. Rec. 13492 (1976) ("Although the provider can sue the State to enjoin action, they *[sic]* cannot sue to recover 'lost funds' because of the immunity to suit afforded States by the 11th Amendment") (remarks of Rep. Rogers).

[16] Indeed, federal courts have continued to entertain such challenges since the passage of the Boren Amendment. All the Circuits that have explicitly addressed the issue have concluded that the amendment is enforceable under § 1983 by health care providers. See *AMISUB (PSL), Inc.* v. *Colorado Dept. of Social Services*, 879 F. 2d 789, 793 (CA10 1989); *West Virginia University Hospitals, Inc.* v. *Casey*, 885 F. 2d 11, 17–22 (CA3 1989), cert. granted, 494 U. S. 1003 (1990); *Coos Bay Care Center*, 803 F. 2d, at 1061–1063; *Nebraska Health Care Assn., Inc.* v. *Dunning*, 778 F. 2d 1291, 1295–1297 (CA8 1985), cert. denied, 479 U. S. 1063 (1987). Other courts have entertained such claims without separately considering whether the providers had a cause of action under § 1983. See *Hoodkroft Convalescent Center, Inc.* v. *New Hampshire Division of Human Services*, 879 F. 2d 968, 972–975 (CA1 1989), cert. denied, 493 U. S. 1020 (1990); *Colorado Health Care Assn.* v. *Colorado Dept. of Social Services*, 842 F. 2d 1158, 1165 (CA10 1988); *Hillhaven Corp.* v. *Wisconsin Dept. of Health and Social Services*, 733 F. 2d 1224, 1225–1226 (CA7 1984); *Alabama Hospital Assn.* v. *Beasley*, 702 F. 2d 955, 955–962 (CA11 1983); *Mississippi Hospital Assn., Inc.* v. *Heckler*, 701 F. 2d 511, 517–520 (CA5 1983); *Charleston Memorial Hospital* v. *Conrad*, 693 F. 2d 324, 326 (CA4 1982); *Washington Health Facilities Assn.* v. *Washington Dept. of Social and Health Services*, 698 F. 2d 964, 965 (CA9 1982).

of "findings" and "assurances," Congress intended to deprive health care providers of their right to challenge rates under § 1983. Instead, as the legislative history shows, the requirements of "findings" and "assurances" prescribe the respective roles of a State and the Secretary and do not, as petitioners suggest, eliminate a State's obligation to adopt reasonable rates.

Nevertheless, petitioners argue that because the Boren Amendment gives a State flexibility to adopt any rates it finds are reasonable and adequate, the obligation imposed by the amendment is too "vague and amorphous" to be judicially enforceable. We reject this argument. As in *Wright*, the statute and regulation set out factors which a State must consider in adopting its rates.[17] In addition, the statute requires the State, in making its findings, to judge the reasonableness of its rates against the objective benchmark of an "efficiently and economically operated facilit[y]" providing care in compliance with federal and state standards while at the same time ensuring "reasonable access" to eligible participants. That the amendment gives the States substantial discretion in choosing among reasonable methods of calculating rates may affect the standard under which a court reviews whether the rates comply with the amendment, but it does not render the amendment unenforceable by a court. While

---

[17] For example, when determining methods for calculating rates that are reasonably related to the costs of an efficient hospital, a State must consider: (1) the unique situation (financial and otherwise) of a hospital that serves a disproportionate number of low income patients, (2) the statutory requirements for adequate care in a nursing home, and (3) the special situation of hospitals providing inpatient care when long-term care at a nursing home would be sufficient but is unavailable. 42 U. S. C. § 1396a(a)(13)(A) (1982 ed., Supp. V). The Boren Amendment provides, if anything, more guidance than the provision at issue in *Wright*, which vested in the housing authority substantial discretion for setting utility allowances. See *Wright v. Roanoke Redevelopment and Housing Authority*, 479 U. S. 418, 437 (1987) (O'CONNOR, J., dissenting) (citing 24 CFR § 965.476(d) (1986)).

there may be a range of reasonable rates, there certainly are *some* rates outside that range that no State could ever find to be reasonable and adequate under the Act.[18]   Although some knowledge of the hospital industry might be required to evaluate a State's findings with respect to the reasonableness of its rates, such an inquiry is well within the competence of the Judiciary.

B

Petitioners also argue that Congress has foreclosed enforcement of the Medicaid Act under § 1983.   We find little merit in this argument.   " 'We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy' for the deprivation of a federally secured right."   *Wright*, 479 U. S., at 423–424 (quoting *Smith* v. *Robinson*, 468 U. S. 992, 1012 (1984)).   The burden is on the State to show "by express provision or other specific evidence from the statute

---

[18] For example, in *AMISUB*, *supra*, at 796, the court invalidated the Colorado plan because the State had not made any findings that its rates were "reasonable and adequate" and because the State conceded that the adoption of its "Budget Adjustment Factor" which divided the median cost of care in half had absolutely no relevance to the costs of an efficient hospital.   See also *Casey*, *supra*, at 22–23 (invalidating Pennsylvania plan because it provided no justification for treating out-of-state hospitals differently than in-state hospitals), cert. granted, 494 U. S. 1003 (1990).   If a State errs in finding that its rates are reasonable and adequate, or in supplying assurances to that effect to the Secretary, then a provider is entitled to have the court invalidate the current state plan and order the State to promulgate a new plan that complies with the Act.   We note that the Courts of Appeals generally agree that when the State has complied with the procedural requirements imposed by the amendment and regulations, a federal court employs a deferential standard of review to evaluate whether the rates comply with the substantive requirements of the amendment. See, *e. g.*, *AMISUB*, *supra*, at 795–801; *Casey*, *supra*, at 23–24; *Dunning*, *supra*, at 1294; *Wisconsin Hospital Assn.* v. *Reivitz*, 733 F. 2d 1226, 1232–1233 (CA7 1984); *Mississippi Hospital Assn.*, *supra*, at 516.   We express no opinion as to which of the cases contains the correct articulation of the appropriate standard of review.

itself that Congress intended to foreclose such private enforcement." *Wright, supra,* at 423. Petitioners concede that the Act does not expressly preclude resort to § 1983. In the absence of such an express provision, we have found private enforcement foreclosed only when the statute itself creates a remedial scheme that is "sufficiently comprehensive . . . to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.,* 453 U. S. 1, 20 (1981).

On only two occasions have we found a remedial scheme established by Congress sufficient to displace the remedy provided in § 1983. In *Sea Clammers, supra,* we held that the comprehensive enforcement scheme found in the the Federal Water Pollution Control Act, 33 U. S. C. § 1251 *et seq.* — which granted the Environmental Protection Agency considerable enforcement power through the use of noncompliance orders, civil suits, and criminal penalties, and which included two citizen-suit provisions — evidenced a congressional intent to foreclose reliance on § 1983. See 453 U. S., at 13. Similarly in *Smith* v. *Robinson, supra,* at 1010–1011, we held that the elaborate administrative scheme set forth in the Education of the Handicapped Act (EHA), 20 U. S. C. § 1400 *et seq.,* manifested Congress' desire to foreclose private reliance on § 1983 as a remedy. The EHA contained a "carefully tailored administrative and judicial mechanism," 468 U. S., at 1009, that included local administrative review and culminated in a right to judicial review. *Id.,* at 1011 (citing 20 U. S. C. §§ 1412(4), 1414(a)(5), 1415).

The Medicaid Act contains no comparable provision for private judicial or administrative enforcement. Instead, the Act authorizes the Secretary to withhold approval of plans, 42 U. S. C. § 1316(a) (1982 ed. and Supp. V), or to curtail federal funds to States whose plans are not in compliance with the Act. 42 U. S. C. § 1396c (1982 ed.). In addition, the

Act requires States to adopt a procedure for postpayment claims review to "ensure the proper and efficient payment of claims and management of the program." 42 U. S. C. § 1396a (a)(37) (1982 ed.). By regulation, the States are required to adopt an appeals procedure by which individual providers may obtain administrative review of reimbursement rates. 42 CFR § 447.253(c) (1989). The Commonwealth of Virginia has adopted a three-tiered administrative scheme within the state Medicaid agency to comply with these regulations. App. 32–43.

This administrative scheme cannot be considered sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983. In *Wright*, we concluded that the "generalized powers" of the Department of Housing and Urban Development (HUD) to audit and cut off federal funds were insufficient to foreclose reliance on § 1983 to vindicate federal rights. 479 U. S., at 428. We noted that HUD did not exercise its auditing power frequently, and the statute did not require, nor did HUD provide, any mechanism for individuals to bring problems to the attention of HUD. *Ibid.;* see also *Rosado*, 397 U. S., at 420–423. Such a conclusion is even more appropriate in the context of the Medicaid Act, since as explained above, see *supra*, at 515–518, a primary purpose of the Boren Amendment was to reduce the role of the Secretary in determining methods for calculating payment rates. It follows that the Secretary's limited oversight is insufficient to demonstrate an intent to foreclose relief altogether in the courts under § 1983.[19]

---

[19] Indeed, this conclusion is even more apt given that Congress believed that a private judicial remedy existed before the passage of the Boren Amendment, see *supra*, at 516–518, when the administrative oversight scheme was more elaborate than it is today.

For the same reasons, we reject the argument that the availability of an action against the Secretary under the APA forecloses § 1983 as a remedy. Putting aside the question whether an APA remedy is available, see n. 12, *supra*, there is absolutely no indication that Congress intended such an ac-

We also reject petitioners' argument that the existence of administrative procedures whereby health care providers can obtain review of individual claims for payment evidences an intent to foreclose a private remedy in the federal courts. The availability of state administrative procedures ordinarily does not foreclose resort to § 1983. See *Patsy* v. *Board of Regents of Fla.*, 457 U. S. 496, 516 (1982). Nor do we find any indication that Congress specifically intended that this .administrative procedure replace private remedies available under § 1983. The regulations allow States to limit the issues that may be raised in the administrative proceeding. 42 CFR § 447.253(c) (1989). Most States, including Virginia, do not allow health care providers to challenge the overall method by which rates are determined.[20] See Brief for American Health Care Association et al. as *Amici Curiae* 20–24, and App. A and B. Such limited state administrative procedures cannot be considered a "comprehensive" scheme that manifests a congressional intent to foreclose reliance on § 1983. See *Wright*, 479 U. S., at 429 (availability of grievance procedure did not prevent resort to § 1983). Thus, we conclude that Congress did not foreclose a private judicial remedy under § 1983.

tion to be the sole method for health care providers to enforce the reimbursement provision. Moreover, given that Congress believed that a private cause of action existed prior to the passage of the Boren Amendment and that the amendment reduced the Secretary's oversight role, it is implausible to infer that Congress intended to replace the private judicial remedy under § 1983 with a proceeding for judicial review under the APA.

[20] The Virginia procedure allows providers to dispute individual payments. It excludes from appeal the following issues: (1) the organization of the peer groups; (2) the use of the reimbursement rates established in the plan; (3) the calculation of the initial group ceilings as of 1982; (4) the use of the consumer price index; and (5) the time limits set forth in the state plan. *Ibid.*

Finally, we reject petitioners' argument that the availability of judicial review under the Virginia Administrative Procedure Act is relevant to the question whether relief is available under § 1983. See *Wright*, 479 U. S., at 429. See generally *Monroe* v. *Pape*, 365 U. S. 167, 183 (1961).

## III

The Boren Amendment to the Act creates a right, enforceable in a private cause of action pursuant to § 1983, to have the State adopt rates that it finds are reasonable and adequate rates to meet the costs of an efficient and economical health care provider. The judgment of the Court of Appeals is accordingly

*Affirmed.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR, JUSTICE SCALIA, and JUSTICE KENNEDY join, dissenting.

The relevant portion of the Boren Amendment requires States to reimburse Medicaid services providers using

"rates (determined in accordance with methods and standards developed by the State . . .) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities . . . ." 42 U. S. C. § 1396a(a)(13)(A) (1982 ed., Supp. V).

The Court notes in its opinion, *ante*, at 504, that respondent seeks permanent relief under § 1983 in the form of court-ordered reimbursement at new rates. Respondent also seeks, as interim relief, reimbursement at rates commensurate with payments under the Medicare program. Complaint ¶¶ 34–39; see App. 22. And though respondent's prayer for relief is only one example of a good claim for relief under today's decision, every § 1983 action hereafter brought by providers to enforce § 1396a(a)(13)(A) will inevitably seek the substitution of a rate system preferred by the provider for the rate system chosen by the State. Thus, whenever a provider prevails in such an action, the defendant State will be enjoined to implement a system of rates other than the rates "determined in accordance with methods and standards

developed by the State," which the "State finds . . . are reasonable and adequate," and with respect to which the State made assurances to the Secretary that the Secretary found "satisfactory." See § 1396a(a)(13)(A). The court orders entered in such actions therefore will require the States to adopt reimbursement rate systems different from those Congress expressly required them to adopt by the above-quoted language.

The Court reasons that the policy underlying the Boren Amendment would be thwarted if judicial review under § 1983 were unavailable to challenge the reasonableness and adequacy of rates established by States for reimbursing Medicaid services providers. This sort of reasoning, however, has not hitherto been thought an adequate basis for deciding that Congress conferred an enforceable right on a party.

Before *Maine* v. *Thiboutot*, 448 U. S. 1 (1980), a plaintiff seeking to judicially enforce a provision in a federal statute was required to demonstrate that the statute contained an implied cause of action. Satisfaction of the now familiar standards from, *e. g.*, *Cort* v. *Ash*, 422 U. S. 66 (1975), was the means for making the requisite showing. The Court's general practice was "to imply a cause of action where the language of the statute explicitly conferred a right directly on a class of persons that included the plaintiff in the case." *Cannon* v. *University of Chicago*, 441 U. S. 677, 690, n. 13 (1979). It was thus crucial to a demonstration of the existence of an implied action for the statute to contain a right "in favor of" the particular plaintiff. See, *Cort*, 422 U. S., at 78 ("First, . . . does the statute create a federal right in favor of the plaintiff?"). The plaintiff then would have to satisfy three additional standards to establish that the statute contained an implied judicial remedy for vindicating that right. See *ibid.* In *Maine* v. *Thiboutot*, the Court essentially removed the burden of making the latter three showings by holding that § 1983 generally (with an exception subsequently

developed in *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1 (1981)) supplies the remedy for vindication of rights arising from federal statutes.

But while the Court's holding in *Thiboutot* rendered obsolete some of the case law pertaining to implied rights of action, a significant area of overlap remained. For relief to be had either under § 1983 or by implication under *Cort* v. *Ash*, *supra*, the language used by Congress must confer identifiable enforceable rights. See *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418, 432–433 (1987) (O'CONNOR, J., dissenting) ("Whether a federal statute confers substantive rights is not an issue unique to § 1983 actions. In implied right of action cases, the Court also has asked, since *Cort* v. *Ash*, 422 U. S. 66, 78 (1975), whether 'the statute create[s] a federal right in favor of the plaintiff'"). In this regard, the Court in *Wright* said that a § 1983 action does not lie where Congress did not intend for the statutory provision "to rise to the level of an enforceable right." *Id.*, at 423 (citing *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 19 (1981)).

In *Cannon*, *supra*, the Court said that "the right- or duty-creating language of the statute has generally been the most accurate indicator of the propriety of implication of a cause of action." *Id.*, at 690, n. 13. This statement is suggestive of the traditional rule that the first step in our exposition of a statute always is to look to the statute's text and to stop there if the text fully reveals its meaning. See, *e. g.*, *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 68 (1982) ("'[O]ur starting point must be the language employed by Congress,' and we assume 'that the legislative purpose is expressed by the ordinary meaning of the words used'") (internal citations omitted). There is no apparent reason to deviate from this sound rule when the question is whether a federal statute confers substantive rights on a § 1983 plain-

tiff. Yet the Court virtually ignores the relevant text of the Medicaid statute in this case.

The Medicaid statute provides for appropriations of federal funds to States that submit, and have approved by the Secretary of Health and Human Services, "State plans for medical assistance." 42 U. S. C. § 1396 (1982 ed., Supp. V). The next provision in the statute specifies requirements for the contents of state medical assistance plans. § 1396a(a). The provision at issue here, § 1396a(a)(13)(A), is simply a part of the thirteenth listed requirement for such plans. In light of the placement of § 1396a(a)(13)(A) within the structure of the statute, see *Pennhurst, supra,* at 19 (emphasizing the statutory "context" of the provision under review), one most reasonably would conclude that § 1396a(a)(13)(A) is addressed to the States and merely establishes one of many conditions for receiving federal Medicaid funds; the text does not clearly confer any substantive rights on Medicaid services providers. This structural evidence is buttressed by the absence in the statute of any express "focus" on providers as a beneficiary class of the provision. See *Wright, supra,* at 430 (finding a provision in the statute "focusing" on the plaintiff class dispositive evidence of Congress' intent in the Brooke Amendment to create rights in favor of the plaintiff class).

Even if one were to assume that the terms of § 1396a(a) (13)(A) confer a substantive right on providers in the nature of a guarantee of "reasonable and adequate" rates, the statute places its own limitation on that right in very plain language. Section 1396a(a)(13)(A) establishes a procedure for establishing such rates of reimbursement. The first step requires the States to make certain findings. The second and only other step requires the States to make certain assurances to the Secretary and the Secretary—not the courts—to review those assurances. Under the logic of our case law, respondent arguably may bring a § 1983 action to require that rates be set according to that process. Indeed, establish-

ment of rates in accordance with that process is the only discernible right accruing to anyone under § 1396a(a)(13)(A). But as this case illustrates, Medicaid providers bring § 1983 actions to *avoid* the process rather than to seek its implementation. The Court approves such challenges despite the fact that a plaintiff's success in such a suit results in the displacement of rates created in accordance with the statutory process by rates established pursuant to court order. To support its decision, the Court looks beyond the unambiguous terms of the statute and relies on policy considerations purportedly derived from legislative history and superseded versions of the statute. See *ante*, at 515–520.

The Court concludes, *ante*, at 519, that the contrary position equates with the proposition that the States are not obligated to adopt reasonable rates. Indeed, the theme of much of the Court's argument is that without judicial enforceability, the States cannot be trusted to implement § 1396a(a)(13) (A)'s command of creating rate systems that are reasonable and adequate. The Court states at one point that "[i]t would make little sense for Congress to require a State to make findings without requiring those findings to be correct. . . . We decline to adopt an interpretation of the Boren Amendment that would render it a dead letter." *Ante*, at 514.

The interpretation to which the Court refers, however, would scarcely render the Boren Amendment a "dead letter." It is, instead, the Court's own reading that nullifies the "letter" of the amendment. Apart from its displacement of the statutory ratesetting process noted previously, the Court's suggestion that the States would deliberately disregard the requirements of the statute ignores the Secretary's oversight incorporated into the statute and does less than justice to the States. The Court itself recognizes that the basic purpose of the Boren Amendment was to allow the States more latitude in establishing Medicaid reimbursement rates. In light of that fact, the Court's interpretation takes far more liberties

with the statutory language than does the position advanced by petitioners.   I would reverse the judgment of the Court of Appeals.