Daniel BELANGER, et al.

v.

**NASHUA, NEW HAMPSHIRE, SCHOOL DISTRICT.**

Civ. No. 93–18–JD.

United States District Court, D. New Hampshire.

May 11, 1994.

Ronald K. Lospennato, for plaintiff.

Judy T. Constantian, Anne L. Weismann, for defendant.

## ORDER

DiCLERICO, Chief Judge.

The plaintiff, Daniel B., by and through his mother and next friend Theresa B.,[1] brought an action against the defendant Nashua School District (the "District"), seeking declaratory and injunctive relief under the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C.A. § 1232g (West 1990 & Supp.1994) and 34 C.F.R. § 99 (1993) and the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. § 1400 *et seq.* (West 1990 & Supp.1994) and 34 C.F.R. § 300.560 (1993). Pursuant to the court's September 7, 1993 order, the parties each filed motions for summary judgment.[2] For the following reasons, the court grants the plaintiff's motion for summary judgment (document no. 12) and denies the defendant's motion (document no. 16).

### Background

The following facts are undisputed. Daniel B., whose date of birth is August 19, 1977, is 16 years old. He has been deemed educationally disabled and is eligible for a free appropriate public education pursuant to federal and state law. Complaint, ¶ 3; Answer, ¶ 3. Daniel B. alleges he is a class member protected by the consent decree entered in, *James O. v. Marston,* No. 86–6–S (D.N.H. Aug. 23, 1991). Complaint, ¶ 5. Daniel B.'s mother, Theresa B., is a resident of Nashua, New Hampshire. Complaint, ¶ 3; Answer, ¶ 3. The District is a corporation organized pursuant to N.H.Rev.Stat.Ann. ("RSA") § 194 and is a local educational agency subject to the provisions of FERPA and IDEA. Complaint, ¶ 4; Answer, ¶ 4.

In July 1992, Daniel B. was placed at Lake Grove School, a residential educational facility in Wendall, Massachusetts. This placement was pursuant to an order of the Nash-

ua District Court under the juvenile delinquency statute, RSA § 169–B. Complaint, ¶ 5; Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Plaintiff's Memorandum") at 1; Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Defendant's Memorandum") at 1. According to the complaint, Daniel B. remains a resident of the Lake Grove School. Complaint, ¶ 5.

In 1988, the District was joined as a party to Daniel B.'s juvenile court proceedings pursuant to RSA § 169–D so it could take part in decisions regarding Daniel B.'s educational placement and services. Appendix to Plaintiff's Memorandum, Deposition of Judy Constantian ("Constantian Deposition") at 3–4. As a party to the juvenile proceedings the District, and/or its attorney, Constantian, acquired documents regarding Daniel B. *Id.* at 8.

The District maintains several sets of files concerning Daniel B., his educational placement, his individual educational plan and services. *Id.* at 16. Attorney Constantian maintains files on Daniel B. separate from the files maintained at the District's central office. Her files contain documents which are not included in Daniel B.'s "cumulative folder" (also known as "cum folder"). *Id.* at 8–10. Attorney Constantian uses the files she maintains in matters concerning Daniel B. *Id.* at 7. She is a member of the team of officials that evaluates Daniel B.'s individual educational plan, educational placement and services. *Id.* at 12–13.

Due to her concern that Daniel B.'s educational placement is inappropriate, Theresa B. made a request to the District on August 19, 1992 for all of Daniel B.'s education rec-

---

1. While Theresa B. brings this action by and through her son, Daniel B., she could have brought this action individually. Through her son she is seeking access to his education records.

2. The United States Department of Education was invited to file a statement of interest in this

case by an order of the court dated November 3, 1993. The Department of Education filed its Statement of Interest with the court on December 20, 1993, explaining its interpretation of "education records" under FERPA. The court appreciates the efforts of the Department of Education in this matter.

ords. Complaint, ¶ 6; Defendant's Memorandum at 1. The District provided her with a copy of Daniel B.'s cum folder, but informed her that "records related to the juvenile action will not be supplied absent a court order from the Nashua District Court." Complaint, ¶¶ 6, 9; Defendant's Memorandum at 2. The plaintiff alleges that pursuant to paragraph 17 of the *James O. v. Marston* consent decree, she filed a request for reimbursement with the District on November 6, 1992. Complaint, ¶ 7. This request was for repayment of "sums she paid relative to the costs for plaintiff's placement" at the Lake Grove School. *Id.* She claims that access to the District's records on Daniel B. is crucial for the advocation of her son's rights and for the successful pursuit of the reimbursement claim. *Id.* at ¶ 8. The District objected to her request for reimbursement on December 22, 1992. *Id.*

### Discussion

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In the instant case, no material facts are in dispute. Accordingly, the court must determine as a matter of law whether the District violated FERPA and IDEA when it denied Theresa B. access to Daniel B.'s "education records" as that term is defined and used in the applicable laws and regulations. *See* 20 U.S.C.A. § 1232g and 34 C.F.R. § 99.1 *et seq.* and IDEA, 20 U.S.C.A. § 1400 *et seq.* and 34 C.F.R. § 300.560 *et seq.*

### A. Enforceability of FERPA and IDEA under 42 U.S.C.A. § 1983

Before addressing the question of whether the requested records are "education records" as defined by FERPA and IDEA, the court must determine whether the plaintiff has a cause of action under § 1983 for the alleged violation of these statutes.[3]

In *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court established that:

§ 1983 is available as a remedy for violations of federal statutes as well as for constitutional violations. [It has] subsequently recognized that § 1983 is not available to enforce a violation of a federal statute "where Congress has foreclosed such enforcement of the statute in the enactment itself and where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983."

*Suter v. Artist M.,* —— U.S. ——, ——, 112 S.Ct. 1360, 1366, 118 L.Ed.2d 1 (1992) (quoting *Wright v. Roanoke Redev. and Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987)).

The framework of the § 1983 analysis for federal funding statutes was developed in *Wright* and *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989), and further refined in *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508–509, 110 S.Ct. 2510, 2516–17, 110 L.Ed.2d 455 (1990).[4] In *Wilder* the Court set forth a two-part test. "A plaintiff alleging a violation of a federal statute will be permitted to sue under § 1983 unless (1) 'the statute [does] not create enforceable rights, privileges, or immunities within the meaning of § 1983,' or (2) 'Con-

---

3. Section 1983 provides,
Every person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
42 U.S.C.A. § 1983 (West 1981).

4. Although no private right of action exists under FERPA, courts consistently held prior to 1992 that plaintiffs could assert their claims under § 1983. *See Tarka v. Cunningham,* 917 F.2d 890, 891 (5th Cir.1990); *Fay v. South Colonie Cent. Sch. Dist.,* 802 F.2d 21, 33 (2d Cir.1986); *Krebs v. Rutgers,* 797 F.Supp. 1246, 1256 (D.N.J.1992). *But see Norris v. Board of Educ.,* 797 F.Supp. 1452, 1465 (S.D.Ind.1992).

gress has foreclosed such enforcement of the statute in the enactment itself.'" *Wilder,* 496 U.S. at 508, 110 S.Ct. at 2517 (quoting *Wright,* 479 U.S. at 423, 107 S.Ct. at 770) (alteration in original).

Under part one of the test, the Court used a three-part inquiry to determine whether the statute "create[s] enforceable rights, privileges, or immunities within the meaning of § 1983." *Id.* The court must determine,

> whether the provision in question was intend[ed] to benefit the putative plaintiff. If so, the provision creates an enforceable right unless it reflects merely a "congressional preference" for a certain kind of conduct rather than a binding obligation on the governmental unit, or unless the interest the plaintiff asserts is too vague and amorphous such that it is beyond the competence of the judiciary to enforce.

*Id.* (citations omitted) (internal quotation marks omitted) (alteration in original).[5]

In *Suter v. Artist M.,* the Court appeared to abandon the framework established in *Golden State* and *Wilder.*[6] The Court was asked to determine whether any enforceable rights existed under 42 U.S.C.A. § 671(a) of the Adoption Assistance and Child Welfare Act ("AACWA"). Section 671(a) of the AACWA specified that in order to be eligible for federal funding, a state "shall have a plan approved by the Secretary," which is to include numerous features. *See* 42 U.S.C.A. § 671(a). Section 671(a)(15), provided, "[i]n each case, *reasonable efforts* will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home...." 42 U.S.C.A. § 671(a)(15) (emphasis added).

The Court observed that "[t]he word 'reasonable' occupied a prominent place in the critical language of the statute" and had to determine whether this language imposed a mandatory obligation on the states, thereby conferring an enforceable right on the plaintiffs. *Suter,* —— U.S. at ——, 112 S.Ct. at 1367. The Court held that the AACWA placed a requirement on the states to submit a plan for approval by the Secretary, but the "reasonable efforts" language failed to impose an obligation on the states to comply with the statute. *Id.* at ——–——, 112 S.Ct. at 1367–1368. The Court stated that "'if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.'" *Id.* at ——, 112 S.Ct. at 1366 (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981)). The "reasonable efforts" language in this statute only imposed a "generalized duty on the State" which did not meet the criteria for a right which could be enforced under § 1983. *Id.,* —— U.S. at ——, 112 S.Ct. at 1370. The Court noted that,

> The language of other sections of the Act ... shows that Congress knew how to impose precise requirements on the States aside from the submission of a plan to be approved by the Secretary when it intended to. For example, 42 U.S.C. § 672(e) provides that "[n]o Federal payment may be made under this part" for a child voluntarily placed in foster care for more than 180 days unless within that period there is a judicial determination that the placement is in the best interest of the child. That the "reasonable efforts" clause is not similarly worded buttresses a conclusion that

---

5. The Court held that the plaintiffs could bring actions under § 1983 to enforce statutory rights in *Wright, Golden State* and *Wilder.* In each case the Court held that the plaintiffs were the intended beneficiaries of the statute, that the language of the statute was mandatory and imposed a binding obligation on the state and that the plaintiffs' interests were specific enough to be enforceable by the judiciary. *See Wilder,* 496 U.S. 498, 110 S.Ct. 2510; *Golden State,* 493 U.S. 103, 110 S.Ct. 444; *Wright,* 479 U.S. 418, 107 S.Ct. 766.

6. In his dissent, Justice Blackmun stated,

> In my view, the Court's conclusion is plainly inconsistent with this Court's decision just two Terms ago in *Wilder* ... More troubling still, the Court reaches its conclusion without even stating, much less applying, the principles our precedents have used to determine whether a statute has created a right enforceable under § 1983. I cannot acquiesce in this unexplained disregard for established law.

*Suter,* —— U.S. at ——, 112 S.Ct. at 1371 (Blackmun, J., dissenting) (citation omitted).

Congress had a different intent with respect to it.

*Id.* at —— n. 12, 112 S.Ct. at 1369 n. 12.

Since *Suter* the First Circuit has had two occasions to determine whether a claim to enforce statutory rights could lie under § 1983. *See Albiston v. Maine Comm'r of Human Servs.*, 7 F.3d 258 (1st Cir.1993); *Stowell v. Ives,* 976 F.2d 65 (1st Cir.1992). In *Albiston* the court held, "that though *Suter* 'shed new light on this fuliginous area of the law,' it was 'much too early to post epitaphs for *Wilder* and its kin,' and that it was 'both prudent and possible to synthesize the teachings of *Suter* with the Court's prior precedents.'" 7 F.3d at 263 (quoting *Stowell,* 976 F.2d at 68); *see also Martin v. Voinovich,* 840 F.Supp. 1175 (S.D.Ohio 1993) (surveying cases from *Thiboutot* to *Albiston*); *Evelyn V. v. Kings County Hosp. Ctr.,* 819 F.Supp. 183 (E.D.N.Y.1993) (surveying cases from *Thiboutot* to *Suter*).

In *Stowell,* the First Circuit was asked to determine whether a recipient under Aid to Families with Dependent Children ("AFDC") can bring an action pursuant to § 1983 to enforce § 1396a of the Medicare Catastrophic Coverage Act (the "Act"). 976 F.2d at 66. The court stated, "[i]n order to establish the existence of a right redressable under section 1983, a plaintiff must allege that a particular statute (or federal constitutional provision) imposes an obligation upon the State." *Id.* at 69.

> The relevant part of the Act simply and forthrightly provides ... "the Secretary shall not approve any State plan for medical assistance" if the State has reduced AFDC payment levels below the level prevailing on May 1, 1988. 42 U.S.C. § 1396a(c)(1). By its express terms, section 1396a(c)(1) obliges the federal government, in the person of the Secretary of Health and Human Services—not the State—to take action.

*Id.* "Thus, *Suter* instructs that, when a provision in a statute fails to impose a direct obligation on the States, instead placing the onus of compliance with the statute's substantive provisions on the federal government, no cause of action cognizable under section 1983 can flourish." *Id.* at 70.

In an attempt to keep their claim alive, the *Stowell* plaintiffs tried to use footnote 12 in *Suter* to their advantage and analogized the language of 42 U.S.C.A. § 1396a with that of 42 U.S.C.A. § 672(e). The *Stowell* court held,

> section 1396a(c)(1) is identical, in relevant respects, not to section 672(e) but to section 671(a)(15)—the statutory provision that the *Suter* Court, in footnote 12, was *contrasting* with section 672(e). The Court deemed it noteworthy that section 671(a)(15) requires "submission of a plan to be approved by the Secretary" while section 672(e) provides that "[n]o Federal payment may be made" unless certain conditions are met.

*Id.* at 71 (alterations in original).

One year later, in *Albiston* the First Circuit was faced with the question of whether the plaintiffs could "compel timely disbursement of [AFDC] 'pass-through' and 'gap' payments" under § 1983. 7 F.3d at 259.[7] The plaintiffs in *Albiston* instituted their suit because of systematic problems AFDC recipients were experiencing in receiving payments to which they were entitled from the state of Maine. *Id.* at 261.

In determining whether the plaintiffs could pursue their claim under § 1983 the First Circuit recognized the framework outlined in the pre-*Suter* cases and also recognized that courts were having difficulty in reconciling these cases with the *Suter* decision. *Id.* at 261–262. The court concluded, "that *Suter* left the basic *Wilder* framework intact, but added a further threshold inquiry, applicable

---

7. AFDC is a voluntary program, but if states choose to participate in it they "must agree to administer it in accordance with a federally approved AFDC plan." *Albiston,* 7 F.3d at 260. Under the statute the states are required to make "gap" payments with "reasonable promptness to all eligible individuals" and "pass-through" payments are to be "prompt." *Id.*

In 1988, responding to complaints of late payments, Congress amended the provision regarding "pass-through" payments to include a time frame for promptness which is not more than fifteen days from receipt of funds by the state. *Id.* at 260–261.

in cases involving 'federal-state funding statutes' enacted pursuant to the 'Spending Clause.'" *Id.* at 263. Not only must a plaintiff who seeks a remedy under § 1983 meet the demands of the *Wilder* test, but also two additional thresholds must be met:

First, although a congressional intent to *create* "enforceable rights" may be presumed simply from the enactment of a federal statute mandating performance of specific duties, a congressional intent to *impose those obligations on participating States* may not be presumed, but must be demonstrated by the § 1983 plaintiff. Second, and equally important, in order to impose a direct obligation on the States, the plaintiff must show that Congress has delineated the obligation "unambiguously," *i.e.*, with sufficient specificity to permit States to exercise their choice [to participate in the statutory scheme] knowingly, cognizant of the consequences of their participation.

*Id.* (citations omitted) (internal quotation marks omitted) (alteration in original). "A federally-imposed statutory obligation is not enforceable in a private action against the State under § 1983 if its terms are so vague and generalized that their 'meaning will ... vary with the circumstances of each [sic] case' so as to be insusceptible to judicial enforcement." *Id.* at 263–264 (quoting *Suter*, —— U.S. at ——, 112 S.Ct. at 1368) (alteration in original).

The *Albiston* court held that the AFDC statute, in plain unambiguous language, imposed direct obligations on the state not only to submit a plan but also to comply with the plan. *Id.* at 264. The use of words such as "shall" and "comply substantially" in the statute were "mandatory in their terms." *Id.* "It is the imposition of mandatory obligations directly on the States, as distinguished from the Secretary, that separates the 'promptness' obligations under [AFDC] from the statutory provisions considered in *Suter* and *Stowell I.*" *Id.* at 265.

The "promptness" requirement was not vague like the "reasonable efforts" language in *Suter* because the "promptness" requirement provided a time frame of not more than fifteen days to give the states guidance for compliance. *Id.* The First Circuit also differentiated the statute in *Albiston* from the statute analyzed in *Stowell*. The statute in *Stowell* contained an explicit direction to the Secretary and did not impose an obligation on the state. *Id.* In *Albiston* the court stated, "although the Secretary retains oversight responsibility for monitoring 'substantial compliance' with the State's plan, plaintiffs do not base their statutory claim on the Secretary's nonperformance of these oversight obligations, but on the State's *separate* 'compliance' obligations as mandated." *Id.*

The *Albiston* court next turned to the second part of the *Suter* inquiry, whether the obligation on the state was unambiguous. The court held that "[a] statute is not impermissibly vague simply because it requires judicial inquiry into 'reasonableness.' Rather, the relevant question is whether the *action or purpose* whose 'reasonableness' is commanded has been clearly delineated and is susceptible of judicial ascertainment." *Id.* at 267 (citations omitted).

After determining that the plaintiffs had survived the *Suter* thresholds, the *Albiston* court turned to the *Wilder* test and held that the plaintiffs met the requirements for part one of the test. *Id.* at 267–268. Under part two of the *Wilder* test, the *Albiston* court addressed whether Congress had precluded private remedies under the statute. "The Supreme Court repeatedly has stated that it 'will not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right.'" *Id.* at 268 (quoting *Wright*, 479 U.S. at 423, 424, 107 S.Ct. at 770). The court held, "where a federal statute erects an administrative scheme for its enforcement, the Court has required States to demonstrate, 'by express provision or other specific evidence from the statute itself,' a congressional intent to preclude private enforcement actions." *Id.* (quoting *Wright*, 479 U.S. at 423, 107 S.Ct. at 770). "[T]he Supreme Court repeatedly has held that administrative enforcement schemes must be presumed to *parallel* the private § 1983 enforcement remedy, rather than to 'occupy the same ground'...." *Id.* at 269 (quoting *Rosado v. Wyman*, 397 U.S. 397, 420, 90 S.Ct. 1207,

1222, 25 L.Ed.2d 442 (1970) ("we are most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program")).

In *Albiston* the administrative scheme appeared to be "intended to protect important *federal* interests," but did not help the individual beneficiaries of the statute. *Id.* The court permitted the plaintiffs to assert their claims under § 1983. *Id.*

### B. Applicability of § 1983 analysis to the plaintiff's claim

Although the complaint alleges violations of FERPA, IDEA and the Fourteenth Amendment Due Process Clause, the plaintiff in the Motion for Summary Judgment sets forth only a § 1983 analysis regarding the FERPA statute. The court will therefore only address whether the plaintiff may proceed under § 1983 with the FERPA claim.

■ Following the synthesis developed in *Albiston* the court must apply the *Suter* "threshold." The court must first make a determination of whether there is "a congressional intent to impose ... obligations on participating States." *Albiston,* 7 F.3d at 263. The language of FERPA reveals a congressional intent to impose obligations directly on educational agencies or institutions.[8]

Section 1232g(a)(1)(A) of FERPA states, in pertinent part,

No funds shall be made available under any applicable program to any educational agency or institution which has a policy of denying, or which effectively prevents, the parents of students who are or have been in attendance at a school of such agency or at such institution ... the right to inspect and review the education records of their children.... Each educational agency or institution shall establish appropriate procedures for the granting of a request by parents for access to the education records

of their children within a reasonable period of time, but in no case more than forty-five days after the request has been made.

20 U.S.C.A. § 1232g(a)(1)(A) (West 1990). To be eligible for federal funds the educational agency or institution must provide parents with access to the education records of their children. This is not merely a congressional preference for a certain action but rather a congressional requirement imposing a mandatory obligation on the educational units to provide such access. In this case the language of 20 U.S.C. § 1232g is analogous to the language of 42 U.S.C. § 672(e), the statute used as an example of a congressional mandate in *Suter* and *Stowell. See Suter,* —— U.S. at —— n. 12, 112 S.Ct. at 1369 n. 12; *Stowell,* 976 F.2d at 71. The *Suter* and *Stowell* courts noted § 672(e) was "a communication from Congress to those States that elect to apply for earmarked funds" as opposed to the statutes at issue in those cases which were held to be "[a] communication to a specific federal official whose approval is required prior to disbursement of federal funds (section 671(a)(15)) ...." *Stowell,* 976 F.2d at 71. Section 1232g does not require a federal official to initiate action in order for an educational agency or institution to receive federal funds, but rather requires specific action by an educational agency or institution.

The second part of the *Suter* threshold is that the obligation on the states, or in this case the educational agencies or institutions, must be "unambiguous." *Albiston,* 7 F.3d at 263. The plain meaning of the language of FERPA sets forth what educational agencies or institutions must do and not do in order to be eligible for federal funds. They must not have a policy which denies or prevents parents from having access to their children's education records or the educational agencies cannot receive funds. In addition, FERPA requires that the educational agencies or institutions establish appropriate procedures allowing parents access to the records upon

---

**8.** The District admits that it is an educational agency or institution subject to the provisions of FERPA. The District was formed and incorporated under New Hampshire law and is regulated by the State Department of Education and the

State Board of Education. Therefore, for purposes of § 1983, the District is a state actor acting under color of law. *See generally West v. Atkins,* 487 U.S. 42, 49–50, 108 S.Ct. 2250, 2255–56, 101 L.Ed.2d 40 (1988).

request. 20 U.S.C.A. § 1232g(a)(1)(A). If a parent requests access to a student's records, the statute requires that access be granted no more than forty-five days after the request is made. *Id.* FERPA permits educational agencies or institutions to "exercise their choice [to participate in the statutory scheme] knowingly, cognizant of the consequences of their participation." *Albiston,* 7 F.3d at 263.

Since the plaintiff's claim survives the *Suter* thresholds, the *Wilder* test must be applied. Under part one of the *Wilder* test, the court must determine whether the statute "create[s] enforceable rights, privileges, or immunities within the meaning of § 1983." *Wilder,* 496 U.S. at 508, 110 S.Ct. at 2517 (citation omitted) (internal quotation marks omitted).

The first step in determining whether "enforceable rights, privileges, or immunities" exist is to ascertain whether the plaintiff is the intended beneficiary of the state obligations. Theresa B. is a parent of a student who must be provided services by the District and therefore it is evident from the plain meaning of the statutory language that she is meant to benefit from FERPA. The court also notes in passing that in the "Joint Statement in Explanation of the Buckley/Pell Amendment [to FERPA]" ("Joint Statement"), the sponsors of FERPA stated, "The purpose of the Act is two-fold—to *assure parents of students . . . access to their education records* and to protect such individuals' rights to privacy by limiting the transferability of their records without their consent." Joint Statement, 120 Cong.Rec. 39858, 39862 (Dec. 13, 1974) (emphasis added).

Next, it must be determined whether FERPA expresses merely a "congressional preference" or imposes a binding obligation on the governmental unit. This inquiry has already been satisfied with the reasoning given under the analysis for part one of the *Suter* threshold. *See Albiston,* 7 F.3d at 268 ("Since we have determined that the statutory responsibilities imposed upon the States by [the statute] are 'unambiguous' and 'mandatory' within the meaning of *Suter,* the second and third parts of the *Wilder* test, re-

quiring a similar analysis, seem clearly to be met.").

The final step for determining whether an enforceable federal right exists is to ascertain whether the plaintiff's claim is " 'too vague and amorphous' such that it is 'beyond the competence of the judiciary to enforce.' " *Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517 (quoting *Golden State,* 493 U.S. at 106, 110 S.Ct. at 448). In this case, the claim asserted by the plaintiff and the remedy sought are very well defined. Theresa B., by and through her son, seeks access to his education records so that she can review them to determine if his educational placement is appropriate. The plaintiff's claim can be readily enforced by the judiciary and the results will not vary based on the facts and the law.

Finally, because the plaintiff's claim satisfies the requirements of part one of the *Wilder* test, the court must apply part two. Under part two, "[t]he burden to demonstrate that Congress has expressly withdrawn the remedy is on the defendant." *Golden State,* 493 U.S. at 107, 110 S.Ct. at 449. In this case the District has not argued that a § 1983 action is foreclosed. "Although FERPA authorizes extensive enforcement procedures created by regulation, *see* 34 C.F.R. §§ 99.60–.67 (1985), these regulations do not demonstrate a congressional intent to preclude suits under section 1983 to remedy violations of FERPA." *Fay,* 802 F.2d at 33.

Despite the fact that the plaintiff's claim survives the *Suter* threshold and the *Wilder* test, the District claims that the plaintiff is not entitled to relief under § 1983 because of a failure to exhaust the administrative remedies. "Although FERPA directs the establishment of an administrative enforcement scheme, there is no explicit exhaustion requirement, nor is there any other indication of an implicit exhaustion requirement." *Krebs,* 797 F.Supp. at 1257. Additionally, though FERPA directs the Secretary of Education to enforce the statute, *see* § 1232g(f) and (g), neither the statute nor the regulations gives an explicit remedy that would be beneficial to the plaintiff in resolving this claim.

The 1991 regulations suggest that the Secretary may withhold authorized federal

**48**

funding if an educational institution fails to correct an identified violation. But the Secretary cannot be expected to threaten and/or act upon this drastic remedy for each and every minor FERPA violation, *nor does this enforcement threat necessarily respond to the harm suffered by aggrieved individuals.*

*Krebs,* 797 F.Supp. at 1257 (emphasis added). Because Congress has not provided an explicit exhaustion requirement in FERPA and the regulations do not provide a course of action such that if the plaintiff were to exhaust the administrative remedies, adequate relief would be obtained, the court finds that the plaintiff may proceed with this claim under § 1983. "[S]ection 1983 claims are presumed to be without an exhaustion requirement, even where there is a federal statutory right accompanied by an administrative agency enforcement scheme." *Id.* at 1257–1258.

### C. Interpretation of "Education Records" Under FERPA

■ Having determined that the plaintiff can proceed under § 1983, the court must next determine whether the records maintained by the District, including those maintained by Attorney Constantian which are not contained in the cum folder, are "education records" under FERPA.

> FERPA defines "education records" as: those records, files, documents, and other materials which—
>
> > (i) contain information directly related to a student; and
> >
> > (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution.

20 U.S.C.A. § 1232g(a)(4)(A) (West 1990 & Supp.1994); *see also* 34 C.F.R. § 99.3 (1993) (defining "education records"). Section 1232g(a)(4)(B) provides four exceptions to this definition.[9] The parties agree that the exceptions are not applicable to this case.

The plaintiff claims that the records requested from the District are maintained by the District or their agents, are directly related to Daniel B., and constitute "education records" under FERPA. According to the District, the requested records do not fall within FERPA's definition of "education records." The District claims that the records are juvenile records under RSA § 169–B because they come from juvenile proceedings at Nashua District Court.

In *Stowell,* the First Circuit noted,

> statutory interpretation always starts with the language of the statute itself. A court should assume that the ordinary meaning of the statutory language accurately expresses the legislative purpose, and should resort to the legislative history and other aids of statutory construction only when the literal words of the statute create ambiguity or lead to an unreasonable result.

*Stowell,* 976 F.2d at 69 (citations omitted) (internal quotation marks omitted).

The District suggests a narrow interpretation of "education records" claiming that because the definition does not specifically state that it includes juvenile records, the records maintained by Attorney Constantian are not "education records" under FERPA. The plain meaning of the statutory language reveals that Congress intended for the definition to be broad in its scope. The statute provides that "records, files, documents, and other materials which . . . contain information directly related to a student" and are "maintained by an educational agency or institution or by a person acting for such agency or institution" are "education records." 20 U.S.C.A. § 1232g(a). Since it is undisputed that the files, records or documents maintained by Attorney Constantian in her capacity as attorney for the District contain information which relates directly to Daniel B., they are "education records" as that term is defined in the statute.

The court will not imply any exclusions to "education records" under the holding in *Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). In *Honig* the Court was

---

**9.** In summary, the exceptions are: i) records kept in the sole possession of the maker, ii) records of a separate law enforcement unit, iii) employment records of those individuals employed by an educational institution or agency, and iv) medical records of students over the age of 18. 20 U.S.C.A. § 1232g(a)(4)(B) (West 1990 & Supp.1994).

asked by the plaintiffs to read an exception into a section of the statute which was the predecessor to IDEA. 484 U.S. at 308, 108 S.Ct. at 596. The Court held that taking the plain meaning of the statutory language as a whole, the power and authority the statute specifically granted to institutions, and the legislative history, the omission of the requested exception had to be intentional. *Id.* at 325, 108 S.Ct. at 605. The Court stated, "we are therefore not at liberty to engraft onto the statute an exception Congress chose not to create." *Id.*

While it is not necessary for the court to look beyond the plain meaning of the statutory language in determining what constitute "education records," the legislative history of FERPA provides additional insight. When FERPA was initially enacted in August 1974, it did not define "education records" but provided a non-exclusive laundry list of records and documents which were to be made available to students and parents. "Juvenile records" were not included on this list. *See* Pub.L. No. 93–380, Title V, § 513(a), 88 Stat. 571, 572 (Aug. 21, 1974).

Recognizing that the statute as enacted was causing confusion in the educational community, Congress passed the Buckley/Pell Amendment (the "Amendment") in December 1974. The Amendment included the current definition of "education records."

> The proposed amendments define "education records" in order to make clear what documents and other material parents and students will have access to . . . [The] intent to be that, except as provided in the definition, *parents and students should have access to everything in institutional records maintained for each student in the normal course of business and used by the institution in making decisions that affect the life of the student.*

120 Cong.Rec. at 39858–39859 (emphasis added). In the Joint Statement the sponsors explained that,

> This definition is a key element in the amendment. An individual should be able to *know, review, and challenge all information*—with certain limited exceptions—that an institution keeps on him, particularly when the institution may make im-

portant decisions affecting his future. . . . This is especially true when the individual is a minor. Parents need access to such information in order to protect the interest of their child.

120 Cong.Rec. 39858, 39862 (emphasis added). The sponsors further stated,

> The amendment ... is intended ... to open the bases on which decisions are made to more scrutiny by the students, or their parents about whom decisions are being made, and to give them the opportunity to challenge and to correct—or at least, enter an explanatory statement—inaccurate, misleading, or inappropriate information about them which may be in their files and which may contribute, or have contributed to an important decision made about them by the institution.

*Id.* The change from the laundry list of items to the definition of "education records" as it appears today, along with the legislative history of the Amendment, lends support to the conclusion that the congressional intent was to fashion a broad definition.

The District's argument concerning the source of the documents maintained by it is without merit. On its face, other than the exceptions that are not applicable, the statutory language does not distinguish records based on their source. Furthermore, it is interesting to note that during a public comment period prior to the issuance of regulations for FERPA, many comments were made requesting the definition of "education records" be changed to "school records." Final Rule on Education Records, 41 Fed.Reg. 24662, 24663 (June 17, 1976). In response to this request, the Department of Health, Education, and Welfare stated, "The statute does not provide for a differentiation between records maintained by an educational agency or institution based on the origin of those records." *Id.* A parent has a right of access to all records maintained by the District which are not subject to the exclusions of § 1232g(a)(4)(B).

The District relies on *Bauer v. Kincaid,* 759 F.Supp. 575 (W.D.Mo.1991), for the proposition that "criminal investigation and incident reports" are not "education records"

under FERPA and thus juvenile records, which would include criminal investigation and incident reports, are not "education records." *See* Defendant's Memorandum at 16–19. The District argues, "Based on the *Bauer* court's finding that records which do not relate to an individual student's academic performance, financial aid or scholastic probation are not education records, the juvenile court records in question are not education records for purposes of FERPA." *Id.* at 19.

The District's reliance on *Bauer v. Kincaid* is misplaced. In *Bauer*, the plaintiff, editor of a university newspaper, sought access to criminal investigation and incident reports, relating to other university students, made and kept by the university's Safety and Security Department. 759 F.Supp. at 577–581. The Department was not a commissioned law enforcement agency, had no educational function, and although it was a "functioning arm of [the university] subject to the general control of ... the Board of Regents," its reports were maintained separately from the university's "education records," as that term is defined in FERPA. *Id.* at 577–578. The university's policy was that the members of the Safety and Security Department did not have access to students' "education records." *Id.* at 578. The *Bauer* court found that the records in question were not "education records," but were the sort of records which "are specifically excluded from the educational records which FERPA protects." *Id.* at 590; *see* 20 U.S.C.A. § 1232g(a)(4)(B)(ii). The court stated that the types of reports established and maintained by the Safety and Security Department were not the "type of information created in the natural course of an individual's status as a student." *Bauer*, 759 F.Supp. at 590.

The facts in *Bauer* can easily be distinguished from this case. First, the plaintiff in *Bauer* was a third party who would not normally be allowed access to education records under FERPA. In this case, the party seeking access is the student's parent, an authorized party under FERPA. *See* 20 U.S.C.A. § 1232g. Also, the records sought in *Bauer* were specifically excluded under FERPA unlike the records requested by the plaintiff in this case which are maintained by

the District and/or its agents. Finally, the District was made a party to Daniel B.'s juvenile proceedings and was sent copies of his records because the proceeding directly affected his status as a student under the supervision of the District. His problems with the court system, along with his educational disabilities, had a direct bearing on his educational and residential placement. Therefore, the records maintained by the District, from whatever source they may have been obtained, have a direct bearing on his placement and educational plan.

The court finds that Daniel B.'s "juvenile records," which are part of Attorney Constantian's file, are "education records." The records in question are directly related to Daniel B., a student, as required under § 1232g(a)(4)(A)(i). Attorney Constantian as agent of the District maintains these records. *See* 20 U.S.C.A. § 1232g(a)(4)(A)(ii). Theresa B., as a parent, has requested access to the records as she has a right to do under § 1232g.

### D. Conflict with RSA § 169–B

 The District also claims that the records held by Attorney Constantian are "juvenile records" which may not be disclosed pursuant to RSA § 169–B without a court order. The District argues that "FERPA and the IDEA do not pre-empt the confidentiality provisions in the state juvenile statutes and, therefore, the District is precluded from releasing the juvenile court records." Defendant's Memorandum at 11.

The District records in question have been found to be "education records," irrespective of their source. For this reason, it is not necessary to determine whether FERPA and IDEA preempt RSA § 169–B. Additionally, the District's argument that it would breach the state statute's confidentiality requirement by disclosing the records to Theresa B. is contrary to what the applicable state statute provides. RSA § 169–B:35 defines juvenile records and governs access to the records. The statute reads, in pertinent part,

I. All case records, as defined in RSA 170–G:8–a, relative to delinquency, shall be confidential and access shall be provided pursuant to RSA 170–G:8–a.

II. Court records of proceedings under this chapter shall be kept in books and files separate from all other court records. *Such records shall be withheld from public inspection but shall be open to inspection by ... a parent, ... the minor's attorney....* Additional access to court records may be granted by court order or upon written consent of the minor.

RSA § 169–B:35 (Supp.1993) (emphasis added).

RSA § 170–G:8–a (Supp.1993) governs the record content and confidentiality provisions for case records created and retained by the Division for Children and Youth Services. Under RSA § 170–G:8–a, II, case records are confidential, but access to the records is authorized for certain listed individuals and entities so long as disclosure would not harm the child.

RSA § 170–G:8–a, II provides, in pertinent part:

(a) The division shall provide access to the case records of the division to the following persons ...

(1) The child named in the case record.

(2) The parent of the child named in the case record....

\* \* \* \* \* \*

(6) Persons made parties to judicial proceedings in New Hampshire relative to the child or family, whether civil or criminal, ... any attorney for any party....

\* \* \* \* . \* \*

(b) The division shall disclose information from case records or provide access to case records to the following persons or entities, if such information or access is not harmful to the child and is necessary in order to enable the person or entity requesting information or access to evaluate or provide services, treatment or supervision to the child named in the case record or to the family:

(1) A person or entity requested by the division or ordered by the court to perform an evaluation or assessment on or to create a service plan for the child....

(2) A person or entity requested by the division or ordered by the court to provide services to the child....

(3) The superintendent of schools for the school district in which the child named in the case record is then, or will, according to the child's case plan, be attending school.

RSA § 170–G:8–a, II. Pursuant to this section, in conjunction with RSA § 169–B:35, the District, Attorney Constantian, Theresa B. and Daniel B. are all authorized to have access to Daniel B.'s records, whatever the source. The District and Attorney Constantian, as an agent of the District, were authorized to have access to Daniel B.'s records because the District was joined as a party to Daniel B.'s juvenile proceedings pursuant to RSA § 169–D. Daniel B. and Theresa B. are authorized to have access under RSA §§ 170–G:8–a, II(a)(1) and (2).

In addition, part VI(a) of RSA § 170–G:8–a states,

Any person who is entitled to access a case record pursuant to this section may share such information with any other person entitled to access pursuant to this section, unless the director or a designee shall specifically prohibit such additional disclosure in order to prevent harm to a child.

RSA § 170–G:8–a, VI(A). The District has not established that such disclosure has been prohibited by the director and therefore the District is authorized to release Daniel B.'s records to Theresa B.

*E. Case or Controversy*

The District argues that no case or controversy exists in this matter because Theresa B. has access to Daniel B.'s Nashua District Court records. Defendant's Memorandum at 8–11. The District also argues that "[Theresa B.] has not shown how her requested relief, a permanent injunction requiring the District to provide [Theresa B.] access to all of Daniel [B.]'s education records, will provide her with any further relief than she already has available to her as a party to the juvenile court action." *Id.* at 11.

The plaintiff's right of access to the records in question had been denied by the

**52**

District. The intent of FERPA is to protect not only the privacy of students, but to ensure that parents have access to their children's education records which are used to make crucial decisions about their children's future. Theresa B. has a right under FERPA to have access to the education records and therefore a case or controversy exists under FERPA which is subject to adjudication by this court.

### Conclusion

For the foregoing reasons, the plaintiff's Motion for Summary Judgment (document no. 12) is granted, and the defendant's Motion for Summary Judgment (document no. 16) is denied.

The Nashua School District is ordered to provide Theresa B. with all of Daniel B.'s education records as herein defined. Costs and reasonable attorney's fees are awarded to the plaintiff.

SO ORDERED.