**Kristja J. FALVO, as parent and next friend of her minor children, Elizabeth Pletan, Philip Pletan, and Erica Pletan; and on behalf of others similarly situated, Plaintiff–Appellant,**

**v.**

**OWASSO INDEPENDENT SCHOOL DISTRICT NO. I–011, a/k/a/ Owasso Public Schools; Dale Johnson, individually and in his official capacity as Superintendent; Lynn Johnson, individually and in her official capacity as Assistant Superintendent; Rick**

---

Thomas, individually and in his official capacity as Principal; John Doe, sued as: Does 1 through 50, Defendants–Appellees.

No. 99–5130.

United States Court of Appeals, Tenth Circuit.

Oct. 4, 2000.

Wilfred K. Wright, Jr., of Tulsa, Oklahoma, for Appellant.

Karen L. Long, of Rosenstein, Fist & Ringold, Tulsa, Oklahoma, (Jerry A. Richardson with her on the brief), for Appellees.

Before LUCERO, McKAY and MURPHY, Circuit Judges.

OPINION

MURPHY, Circuit Judge.

## I. INTRODUCTION

In the instant case, this court must decide whether a practice employed by pre-secondary school[1] teachers in the Owasso Independent School District (the "School District") of allowing their students both to grade one another's tests and other work and to call out their own grades in class (the "grading practice") violates either the Fourteenth Amendment to the United States Constitution or the Family Education Rights and Privacy Act ("FERPA"). Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we conclude that although the Fourteenth Amendment does not preclude the grading practice, FERPA does. The individual defendants, however, are entitled to qualified immunity because it was not clearly established law that the grading practice violated FERPA. This court therefore **affirms** the district court's grant of summary judgment in favor of all defendants on the constitutional claim and **reverses** the grant of summary judgment in favor of the School District on the FERPA claim. Also as to the FERPA claim, we **affirm** the grant of summary judgment in favor of the individual defendants on the plaintiff's claim for monetary relief, but **reverse** the judgment on the plaintiff's claim for injunctive relief.

## II. BACKGROUND

Kristja J. Falvo is the mother of Elizabeth, Philip, and Erica Pletan, who all attended school in the School District. Falvo learned that a number of her chil-

dren's teachers would sometimes have their students grade one another's work assignments and tests and then would have the students call out their own grades to the teacher. During the 1997–98 and 1998–99 school years, Falvo complained about this grading practice to school counselors and to the School District superintendent, claiming it severely embarrassed her children by allowing other students to learn their grades. Although Falvo was told that her children always had the option of confidentially reporting their grades to the teacher,[2] the School District refused to disallow the grading practice.

In October 1998, when Falvo's children were in the sixth, seventh, and eighth grades, she brought a class action lawsuit pursuant to 42 U.S.C. § 1983 against the School District, Superintendent Dale Johnson, Assistant Superintendent Lynn Johnson, and Principal Rick Thomas (the "individual defendants"), alleging the grading practice violated Fourteenth Amendment privacy rights and FERPA. Before the district court resolved whether to certify the class, Falvo moved for declaratory and summary judgment on her two claims. The School District filed a cross-motion for summary judgment on both claims. The district court applied the test articulated in *Flanagan v. Munger,* 890 F.2d 1557, 1570 (10th Cir.1989) and concluded the grading practice did not implicate a constitutionally-protected privacy interest. Additionally, the district court ruled that the grades subject to the grading practice do not constitute "education records" under FERPA. Thus, the district court granted summary

---

1. The record indicates that the plaintiff students were in the sixth through eighth grades during the relevant time period and that this school district has a different school for each of these grades. We thus employ the term "pre-secondary school" to encompass the institutions attended by all three children.

2. Falvo has not asserted that the distinct practice of calling out grades in class constitutes a violation of the Constitution and FERPA, independent of the process of having children

dren exchange papers for grading. In fact, she testified that the calling out of her children's grades did not really matter because the prior act of one student grading another's paper itself constitutes a disclosure. As a consequence, this court need not determine whether the challenge to the practice of calling out grades in class is resolved by the option which the School District provided Falvo's children to privately report their own grades to the teacher.

judgment in favor of all defendants on both claims.

Falvo then moved for reconsideration and clarification of the district court's judgment, arguing the court should have granted relief in favor of Philip Pletan on the Fourteenth Amendment claim because, as a special education student, he had a legitimate expectation of privacy in his grades under the Individuals with Disabilities Education Act ("IDEA"). The district court denied that motion, concluding that because Falvo did not make a distinct claim under IDEA, she could not premise a Fourteenth Amendment claim on that statute.

On appeal, Falvo asserts the district court erroneously granted summary judgment in favor of the defendants, because the grading practice violates both the Fourteenth Amendment and FERPA.

## III. DISCUSSION

### A. Standard of Review

 This court conducts a *de novo* review of a district court's summary judgment decision. *See Bancoklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1097 (10th Cir.1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In applying this standard, this court views the evidence and draws reasonable inferences therefrom in a light most favorable to the party opposing summary judgment. *See Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 450 (10th Cir.1996). Although the instant case involves cross-motions for summary judgment, this court nonetheless views the evidence in a manner most favorable to Falvo, because she is the party challenging

the district court's grant of summary judgment.

### B. The Fourteenth Amendment Claim

 Falvo contends the right to privacy under the Fourteenth Amendment prohibits public disclosure of students' grades. She thus argues the district court erred in dismissing her Fourteenth Amendment claim because the grading practice employed by her children's teachers impermissibly infringes upon that constitutional privacy right. Although this court acknowledges the existence of a Fourteenth Amendment right to prevent disclosure of certain types of personal information, the school work and test grades of pre-secondary school students do not rise to the level of this constitutionally-protected category of information.

In relevant part, the Fourteenth Amendment states, "nor shall any State deprive any person of ... liberty ... without due process of law." U.S. Const. Amend. XIV, § 1. In *Roe v. Wade*, the Supreme Court announced that a constitutional "right of privacy ... [is] founded in the Fourteenth Amendment's concept of personal liberty." 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Subsequently, the Court noted that one type of constitutionally-protected privacy right "is the individual interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); *see also Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 457, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977).

 In assessing whether a specific category of information is constitutionally protected, this court "must consider, (1) if the party asserting the right has a legitimate expectation of privacy [in that information], (2) if disclosure serves a compelling state interest, and (3) if disclosure can be made in the least intrusive manner."[3]

---

**3.** This test differs significantly from the analysis employed to determine the constitutionality of governmental infringement of other types of liberty interests. In these other con-

*Denver Policemen's Protective Ass'n v. Lichtenstein,* 660 F.2d 432, 435 (10th Cir. 1981); *see also Flanagan,* 890 F.2d at 1570. Although this test's formulation seems to indicate this court must consider all three factors, the actual application of the test in prior cases demonstrates that we need not address the second and third factors if the first is not met. *See Nilson v. Layton City,* 45 F.3d 369, 371 (10th Cir.1995) ("Because the alleged unconstitutional conduct in this case fails to meet the first prong of this test, we hold that Mr. Nilson has no constitutional privacy in his expunged criminal record."); *Flanagan,* 890 F.2d at 1571 ("Since we hold that the information released by Chief Munger is not of a highly personal nature, we deny the plaintiffs' privacy claim."). In other words, if Falvo and her children do not have a legitimate expectation of privacy in the children's school work and test grades, they have no Fourteenth Amendment privacy right protecting those grades from disclosure.

■ A party's expectation in the privacy of specific information is sufficiently legitimate to warrant constitutional protection only if that information "is highly personal or intimate." *Nilson,* 45 F.3d at 372. Although this court acknowledges that the school work and test grades of pre-secondary school students constitute somewhat personal or intimate information, we cannot conclude that these grades are so highly personal or intimate that they fall within the zone of constitutional protection; to hold otherwise would trivialize the Four-

teenth Amendment. *Accord Alexander v. Peffer,* 993 F.2d 1348, 1350–51 (8th Cir. 1993); *Davis v. Bucher,* 853 F.2d 718, 721 (9th Cir.1988); *see generally Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (noting that even the Supreme Court "must . . . exercise the utmost care" when asked to announce a new substantive due process right (quotation omitted)).

■ Falvo contends that she and her children have a legitimate expectation of privacy in these grades because two federal statutes, FERPA and IDEA, provide just such an expectation. This court has recognized that "[t]he presence of privacy statutes and regulations may inform our judgment concerning the scope of the constitutional right to privacy." *Flanagan,* 890 F.2d at 1571. In several prior public disclosure cases, however, this court has refused to premise a constitutional privacy right merely on the existence of state privacy statutes. *See id.; Nilson,* 45 F.3d at 372; *Mangels v. Pena,* 789 F.2d 836, 839 (10th Cir.1986). In one such case, this court explained, "Rights of substantive due process are founded not upon state provisions but upon deeply rooted notions of fundamental personal interests derived from the Constitution. . . . Any disclosed information must itself warrant protection under constitutional standards." *Mangels,* 789 F.2d at 839. This court therefore must similarly conclude that federal privacy statutes standing alone cannot be the basis for a Fourteenth Amendment right

texts, a court first ascertains whether a liberty interest exists. *See, e.g., Seamons v. Snow,* 84 F.3d 1226, 1234–35 (10th Cir.1996). Similarly here, this court must first determine whether the claimant possessed a form of liberty interest, a legitimate expectation of privacy in the information sought to be protected. *See Denver Policemen's Protective Ass'n v. Lichtenstein,* 660 F.2d 432, 435 (10th Cir.1981). The tests, however, diverge at this point. In the usual Fourteenth Amendment liberty analysis, a court, having resolved that a liberty interest exists, then determines the degree of importance of that liberty interest in order to decide which level of analytical scrutiny to apply.

*See, e.g., United States v. Deters,* 143 F.3d 577, 583 (10th Cir.1998). Under the test articulated in *Lichtenstein,* once a legitimate expectation of privacy is established, the court must automatically subject the governmental deprivation to strict scrutiny without ever determining whether the expectation of privacy constitutes a fundamental right. *See Lichtenstein,* 660 F.2d at 435; *see also infra* note 4 (noting a further distinction between this court's jurisprudence regarding the constitutional right to have personal information protected and other types of Fourteenth Amendment liberty interests).

to prohibit disclosure of personal information.[4] Thus, contrary to Falvo's contention, neither FERPA nor IDEA can create a Fourteenth Amendment privacy right; rather, the grades themselves must warrant constitutional protection.

Although this court's conclusion, discussed *infra*, that FERPA prohibits revelation of students' school work and test grades informs our judgment about the scope of the constitutional right to prevent disclosure of personal information, we cannot say the right to prevent disclosure of pre-secondary school work and test grades is a "deeply rooted notion[ ] of fundamental personal interest[ ] derived from the Constitution."[5] *Id.* Falvo and her children therefore lack a sufficiently legitimate expectation of privacy in those grades to claim a constitutional right in their protection. This court thus concludes the district court properly granted summary judgment in favor of the defendants on Falvo's Fourteenth Amendment claim.

## C. FERPA Claim

### 1. Jurisdiction

■ Although most courts have concluded that a violation of FERPA may be the basis for a civil rights lawsuit under 42 U.S.C. § 1983, the parties have not raised that issue in the instant case. *See Tarka v. Cunningham,* 917 F.2d 890, 891 (5th Cir.1990); *Fay v. South Colonie Cent. Sch. Dist.,* 802 F.2d 21, 33 (2d Cir.1986); *Achman v. Chisago Lakes Indep. Sch. Dist. No. 2144,* 45 F.Supp.2d 664, 672–74 (D.Minn.1999); *Doe v. Knox County Bd. of Educ.,* 918 F.Supp. 181, 184 (E.D.Ky.1996);

*Maynard v. Greater Hoyt Sch. Dist. No. 61–4,* 876 F.Supp. 1104, 1107 (D.S.D.1995); *Belanger v. Nashua, N.H. Sch. Dist.,* 856 F.Supp. 40, 47–48 (D.N.H.1994); *Norwood v. Slammons,* 788 F.Supp. 1020, 1026 (W.D.Ark.1991). *But see Gundlach v. Reinstein,* 924 F.Supp. 684, 692 (E.D.Pa.1996); *Norris v. Board of Educ. of Greenwood Cmty. Sch. Corp.,* 797 F.Supp. 1452, 1465 (S.D.Ind.1992). Whether the alleged violation of FERPA is actionable under 42 U.S.C. § 1983, however, may implicate this court's and the district court's subject matter jurisdiction over Falvo's FERPA claim. *See Duke v. Absentee Shawnee Tribe of Okla. Hous. Auth.,* 199 F.3d 1123, 1126 (10th Cir.1999) ("Federal question jurisdiction exists when a cause of action 'aris[es] under the Constitution, laws, or treaties of the United States.'" (quoting 28 U.S.C. § 1331)), *cert. denied,* —— U.S. ——, 120 S.Ct. 2014, 146 L.Ed.2d 963 (2000); *see also Ackerley Communications of Fla., Inc. v. Henderson,* 881 F.2d 990, 993 (11th Cir.1989) (dismissing for lack of subject matter jurisdiction a claim premised on the violation of a federal statute because § 1983 does not provide a remedy for a violation of that particular statute); *Belanger,* 856 F.Supp. at 42 ("Before addressing the question of whether the requested records are 'education records' as defined by FERPA ..., the court *must determine* whether the plaintiff has a cause of action under § 1983 for the alleged violation of [this] statute[ ]." (emphasis added)). Because the issue was not raised by the parties, this court does not decide if subject matter jurisdiction hinges on whether a federal statute is remediable under

---

4. We acknowledge the possible inconsistency between such precedent and both the legitimate expectation of privacy test itself and other Tenth Circuit case law which holds that constitutionally-protected liberty interests can spring from statutes. *See, e.g., Wildermuth v. Furlong,* 147 F.3d 1234, 1237 (10th Cir.1998). Nonetheless, this court is bound by this Circuit's controlling authority in this particular area of Fourteenth Amendment jurisprudence. *See In re Smith,* 10 F.3d 723, 724 (10th Cir.1993).

5. This court need not resolve whether IDEA similarly prohibits the grading practice, because even if the grading practice does violate that statute, we still could not conclude that the right to prevent disclosure of these grades is a "deeply rooted notion[ ] of fundamental personal interest[ ] derived from the Constitution." *Mangels v. Pena,* 789 F.2d 836, 839 (10th Cir.1986).

§ 1983 or if that question is more properly resolved pursuant to Federal Rule of Civil Procedure 12(b)(6). Heeding the lesson of *Steel Company v. Citizens for a Better Environment*, we will assume, without deciding, that subject matter jurisdiction is implicated by the question whether § 1983 provides a remedy for the alleged FERPA violation and thus resolve that question before addressing the merits of Falvo's FERPA claim. *See* 523 U.S. 83, 95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (discussing federal appellate court's duty to decide whether it has jurisdiction, even when jurisdiction is not challenged by parties, before addressing the merits of the appeal).

■ In *Wilder v. Virginia Hospital Ass'n*, the Supreme Court stated, "A plaintiff alleging a violation of a federal statute will be permitted to sue under § 1983 unless (1) the statute [does] not create enforceable rights, privileges, or immunities within the meaning of § 1983, or (2) Congress has foreclosed such enforcement of the statute in the enactment itself."[6] 496 U.S. 498, 508, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (quotations omitted). To resolve the first part of this test, this court must decide

> whether the provision in question was intend[ed] to benefit the putative plaintiff. If so, the provision creates an enforceable right unless it reflects merely a congressional preference for a certain kind of conduct rather than a binding obligation on the governmental unit, or unless the interest the plaintiff asserts is too vague and amorphous such that it is beyond the competence of the judiciary to enforce.

*Id.* at 509, 110 S.Ct. 2510 (citations and quotations omitted).

The plain language of the relevant provision of FERPA, 20 U.S.C. § 1232g(b)(1), reveals that it is intended to protect the privacy of students and their parents. Moreover, the sponsors of the amendment to FERPA which added this particular provision stated, "The purpose of the Act is two-fold—to assure parents of students ... access to their education records and to protect such individuals' rights to privacy by limiting the transferability of their records without their consent." 120 Cong. Rec. 39862 (Dec. 13, 1974) (Joint Statement in Explanation of Buckley/Pell Amendment). The relevant provision of FERPA, therefore, was intended to benefit Falvo and her children. Additionally, this provision reflects a binding obligation on schools, rather than a mere congressional preference for a certain kind of conduct. Under the provision, an educational agency or institution is absolutely precluded from receiving federal funds if it maintains a policy or practice of allowing disclosure of education records to unauthorized individuals or entities without parental consent. *See* 20 U.S.C. § 1232g(b)(1). The language of this provision is akin to other statutory language which the Supreme Court has interpreted as creating "precise requirements." *Suter v. Artist M.*, 503 U.S. 347, 361 n. 12, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992); *see also Belanger*, 856 F.Supp. at 46, 47. Finally, as this court's statutory analysis, *infra*, makes clear, the interest which Falvo asserts is neither vague nor amorphous and is thus within the competence of the judiciary to enforce. We therefore conclude 20 U.S.C. § 1232g(b)(1) creates an enforceable right within the meaning of § 1983.

**6.** Some courts have concluded that in *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the Supreme Court imposed additional requirements upon this analytical framework. *See, e.g., Albiston v. Maine Comm'r of Human Servs.*, 7 F.3d 258, 262–63 (1st Cir.1993). This court, however, has held that any analytical additions announced in *Suter* are "no longer to be followed" in light of post-*Suter* congressional action. *Stanberry v. Sherman*, 75 F.3d 581, 584 (10th Cir.1996); *see also Blessing v. Freestone*, 520 U.S. 329, 340–41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (employing the pre-*Suter* analytical framework).

This conclusion raises a rebuttable presumption, under the second part of the *Wilder* test, that Congress did not impliedly foreclose a § 1983 remedy by creating a comprehensive remedial scheme within FERPA itself.[7] *See Blessing v. Freestone,* 520 U.S. 329, 341, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997); *Wilder,* 496 U.S. at 520–21, 110 S.Ct. 2510. "We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right." *Wright v. Roanoke Redevelopment and Hous. Auth.,* 479 U.S. 418, 423–24, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) (quotation omitted). In only two cases has the Supreme Court concluded that a sufficiently comprehensive scheme exists within a statute to demonstrate Congress' intent to foreclose a § 1983 remedy. *See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 19–20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Smith v. Robinson,* 468 U.S. 992, 1011, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), *overruled by statute on other grounds as recognized in Fontenot v. Louisiana Bd. of Elementary and Secondary Educ.,* 805 F.2d 1222, 1223 (5th Cir.1986). The statutes in both of those cases contained extensive remedial schemes, including noncompliance orders, local administrative procedures, civil suits, and criminal penalties. *See Sea Clammers,* 453 U.S. at 13–14, 101 S.Ct. 2615; *Smith,* 468 U.S. at 1009, 104 S.Ct. 3457. FERPA's remedial scheme is far more limited.

The only remedy Congress provided within FERPA itself is allowing the Secretary of Education to cut off federal funding to educational institutions that violate the statute. *See* 20 U.S.C. § 1232g(b), (f). In FERPA, Congress also directed the Secretary of Education to "establish or designate an office and review board within the Department [of Education]" to investigate, process, review, and adjudicate FERPA violations and complaints alleging such violations. *See id.* § 1232g(g). The Department of Education, in accordance with Congress' directive to "take appropriate actions to enforce" FERPA, has promulgated regulations which establish more detailed administrative proceedings through which a parent or student may seek to remedy a FERPA violation. *Id.* § 1232g(f); *see* 34 C.F.R. §§ 99.60–.67. Ultimately, however, the only remedy which a complaining parent or student may obtain through these proceedings is the same which Congress itself set out in the statute: the Secretary of Education may terminate the violating institution's federal funding. *See* 34 C.F.R. § 99.67.

In *Wright,* the Supreme Court concluded that an administrative scheme in the federal Housing Act, which provided the administering agency the power to audit, enforce contracts, *and cut off federal funds,* was "insufficient to indicate a congressional intention to foreclose § 1983 remedies." 479 U.S. at 428, 107 S.Ct. 766; *see also Blessing,* 520 U.S. at 348, 117 S.Ct. 1353; *Wilder,* 496 U.S. at 522, 110 S.Ct. 2510. Pursuant to Supreme Court precedent, therefore, this court must conclude that the only remedy provided for in FERPA and its associated regulations—the termination of federal funding—is not sufficiently comprehensive to "raise a clear inference" of congressional intent to foreclose a § 1983 remedy. *Wright,* 479 U.S. at 425, 107 S.Ct. 766; *see also Fay,* 802 F.2d at 33 ("Although FERPA authorizes extensive enforcement procedures created by regulation, these regulations do not demonstrate a congressional intent to preclude suits under section 1983 to remedy violations of FERPA." (citation omitted)); *Achman,* 45 F.Supp.2d at 673–74; *Maynard,* 876 F.Supp. at 1107.

This court, therefore, has subject matter jurisdiction over Falvo's appeal of the district court's dismissal of her FERPA

---

7. Congress did not "expressly ... forbid[ ] recourse to § 1983 in the statute itself." *Blessing,* 520 U.S. at 341, 117 S.Ct. 1353.

claim, because the specific violation of FERPA which she alleged is actionable under § 1983.

### 2. Merits

■] In assessing Falvo's claim under FERPA, this court shifts its analytical mode from that employed in resolving her constitutional claim. When asked to pronounce the existence of a previously unrecognized constitutional right, this court must proceed with great caution, because "[b]y extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action." *Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2258.[8] Constitutional scrutiny is thus cloaked in a "backdrop of history, tradition, and practice"; it requires vigilance that the examination is not subtly driven by the personal "policy preferences of the [m]embers of [the] [c]ourt," unelected public officials. *Id.* at 719, 720, 117 S.Ct. 2258. Statutory analysis, however, is differently clad: the court weighs the words of elected legislators to resolve their meaning. This court must go wherever the language and intent of the statute take us. Should our interpretation cause public discomfort or impose undesired burdens, it is to the source of the enactment, Congress, that those who are discomforted or burdened must turn for relief. *See Patter-*

son v. McLean Credit Union, 491 U.S. 164, 172–73, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). With that approach in mind, we proceed to examine Falvo's claim under FERPA.

■] FERPA prohibits educational agencies or institutions from maintaining "a policy or practice of permitting the release of *education records* (or personally identifiable information contained therein ... ) of students without the written consent of their parents" to anyone other than statutorily-designated authorities or individuals, which does not include other students. 20 U.S.C. § 1232g(b)(1) (emphasis added). The statute defines "education records" as "those records, files, documents, and other materials which—(i) contain information directly related to a student; and (ii) are *maintained* by an educational agency or institution or by a person acting for such agency or institution." *Id.* § 1232g(a)(4)(A) (emphasis added).

The district court granted the School District's summary judgment motion on Falvo's FERPA claim because it concluded the grades of Falvo's children which were revealed to other students were not "maintained" by the School District and thus do not constitute "education records" within the meaning of FERPA. In so ruling, the district court gave deference to the interpretation set out both in a 1993 letter (the "Rooker letter")[9] written by LeRoy S.

---

**8.** This court recognizes that in *Washington v. Glucksberg*, the question presented was whether the Constitution itself created a liberty interest in physician-assisted suicide. *See* 521 U.S. 702, 705–06, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). Under the law of this Circuit, a constitutionally-protected liberty interest in the non-disclosure of personal information can only arise from the Constitution and not from federal or state statutes and regulations. *See supra* notes 3–4 and accompanying text. For that reason, *Glucksberg* is relevant to resolving Falvo's constitutional claim. The applicability of *Glucksberg*, however, is not as clear in other areas of Fourteenth Amendment jurisprudence in which a statute can create a constitutionally-protected liberty interest and the only question is whether the Constitution limits the manner in

which that interest can be deprived. *See supra* note 4.

**9.** The Rooker letter was drafted in response to inquiries made by a union representative of the New York State United Teachers about the legality under FERPA of certain practices by school officials. It states,

FERPA would not prohibit teachers from allowing students to grade a test or homework assignment of another student or from calling out that grade in class, even though such grade may eventually become an education record. Such papers being graded and the grades which will be assigned would fall outside the FERPA definition of education records as they are not, strictly speaking, "maintained" by an educational agency or institution at that point.

Rooker, the Director of the Family Policy Compliance Office ("FPCO") within the United States Department of Education, and in a 1999 sworn declaration by Rooker (the "Rooker declaration") that the Rooker letter states the current position of the FPCO regarding the grading practice. On appeal, Falvo contends the district court both improperly deferred to the interpretation in the Rooker letter and Rooker declaration and misconstrued the statute. This court agrees with both of these contentions and thus concludes that the district court erroneously determined the term "education records" within FERPA does not encompass the grades at issue here.

▮▮▮ The district court erred in granting deference to the Rooker letter and declaration for two reasons. First, as discussed *infra*, the meaning of the terms "education records" and "maintain" are clear from the statute itself, and a court can only defer to an agency's interpretation if a statute is deemed ambiguous. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (holding that when a court is asked to construe an ambiguous statute, it must defer to the interpretation set out in a regulation promulgated by the agency charged with administering the statute, so long as the agency's interpretation is reasonable). Second, even if the relevant statutory language was ambiguous, the Supreme Court recently announced that *Chevron* deference does not extend to an interpretation contained in an opinion letter issued by the administering agency. *See Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 1662, 146 L.Ed.2d 621 (2000). The district court thus erred in affording *Chevron* deference to the Rooker letter and declaration.

The Supreme Court did state, however, that interpretations contained in agency opinion letters "are 'entitled to respect' under our decision in *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)." *Christensen,* 120 S.Ct. at 1663. In *Skidmore,* the Court earlier stated that the weight which a court should afford such non-binding agency interpretations "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140, 65 S.Ct. 161. Even if the language of FERPA was ambiguous, the Rooker letter and declaration would carry minimal persuasive power under *Skidmore.*

A statement of qualification contained earlier in the letter indicates that in issuing the opinion, the FPCO may not have thoroughly considered the issue before this court. That portion of the letter states,

> Because you do not fully explain the details surrounding the activities you identify, it would not be appropriate for this Office to comment on whether the District's participation in the activities would violate rights afforded parents by FERPA. However, below is a general discussion of FERPA as it relates to the types of activities you present.

Additionally, the Rooker letter and declaration are bereft of any reasoning underlying the rather conclusory opinion that grades written down by other students and announced to the teacher are not "maintained" as required under FERPA. The Rooker letter's power to persuade is further diminished because it rests its statutory interpretation on the conclusion that the grades are not " 'maintained' by an educational agency or institution," ignoring the broader language of FERPA which encompasses records "maintained by an educational agency or institution *or by a person acting for such agency or institution.*" 20 U.S.C. § 1232g(a)(4)(A)(ii) (emphasis added). The Rooker declaration, however, which was submitted in the instant case over five years after the Rooker letter was issued, at least indicates the FPCO's interpretation of FERPA as it

relates to the grading practice has been consistent for some time. Nonetheless, because the Rooker letter and declaration lack sufficient reasoning, fail to account for the breadth of FERPA's language, and indicate the FPCO's somewhat cursory and purely hypothetical consideration of the issue before this court, the interpretation of FERPA offered in those documents is not persuasive.

Based purely on the language of the statute itself, this court concludes the grades which students record on one another's homework and test papers and then report to the teacher[10] constitute "education records" under FERPA. The statute provides that "education records" are "those records, files, documents, and other materials which—(i) contain information directly related to a student; and (ii) are maintained ... by a person acting for [an educational] agency or institution." *Id.* § 1232g(a)(4)(A). There is no dispute that the grades which students place on each other's papers and then report to the teacher "contain information directly related to a student" and thus satisfy the first element of the statutory definition for "education record." *Id.* § 1232g(a)(4)(A)(i). To constitute an "education record," however, these grades must also be "maintained ... by a person acting for [an educational] agency or institution." *Id.* § 1232g(a)(4)(A)(ii).

The undisputed evidence indicates that at least some grades which students give one another and report to the teacher are then recorded in the teacher's grade book. At that later time when the grades are placed in the teacher's grade book, they are "maintained ... by a person acting for [an educational] agency or institution" and constitute "education records." *Id.* FERPA itself provides, "The term 'education records' does not include [ ] records of instructional ... personnel ... which are in the sole possession of the maker thereof

*and which are not accessible or revealed to any other person except a substitute ...."* *Id.* § 1232g(a)(4)(B)(i) (emphasis added). This language explicitly provides that records of instructional personnel, such as grade books, do not constitute "education records" *only* if they "are not accessible or revealed to any other person except a substitute." *Id.* Therefore, grade books disclosed to people other than substitute teachers, such as students, do qualify as "education records." Because grade books, except those disclosed only to substitutes, fall within the statutory definition of "education records" and because one element of that definition is that the records are "maintained," grade books and the grades within are necessarily "maintained" by a person acting for the educational institution, as required by FERPA.

 The School District contends the language of § 1232g(a)(4)(B)(i) categorically excludes grade books, and hence, the grades at issue in the instant case, from the definition of "education records." The School District's proposed construction of this provision, however, defies both the plain language of this provision and a well-settled rule of statutory construction. "[A] statute must, if possible, be construed in such fashion that every word has some operative effect." *United States v. Nordic Village, Inc.,* 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). If § 1232g(a)(4)(B)(i) excludes records such as grade books from the definition of "education records" in an unqualified manner, as the School District urges, the language "and which are not accessible or revealed to any other person except a substitute" becomes meaningless. If grade books never constitute "education records," teachers would be free under FERPA to reveal them to anyone, thus obviating the need to provide in the statute for allowing disclosure to substitute teachers.

---

**10.** As mentioned *supra* note 2, the method of reporting the grade is irrelevant to our analysis, because a disclosure occurs at the earlier stage when one student grades the work of another.

In its petition for rehearing, the School District argues that interpreting § 1232g(a)(4)(B)(i) as merely allowing for the disclosure of grade books to substitutes, as this court does, "renders subsection 1232g(a)(4)(B)(i) superfluous, because subsection 1232g(b)(1)(A) already provides that it is not a violation of FERPA to allow access to education records" by substitute teachers. As just explained, however, it is the School District's construction of § 1232g(a)(4)(B)(i) which renders language within that subsection meaningless. This court's interpretation of § 1232g(a)(4)(B)(i) does not suffer that same malady.

It is important to note that FERPA serves two general purposes: (1) prohibiting disclosure of private education records, the aspect of FERPA at issue in the instant case; and (2) providing parents access to their children's education records. *See id.* § 1232g(a)(1)(A), (b)(1). In light of this second purpose, § 1232g(a)(4)(B)(i), as interpreted by this court, means that a teacher may reveal a grade book to a substitute teacher without being required to also disclose that grade book to a parent; if, however, the teacher reveals the grade book to anyone other than a substitute, the grade book becomes an "education record" to which a parent gains the right to access. The School District, therefore, is wrong to assert that § 1232g(a)(4)(B)(i), which allows a teacher to disclose a grade book to a substitute only, is superfluous because such disclosure is already permitted under § 1232g(b)(1)(A). Section 1232g(a)(4)(B)(i), unlike § 1232g(b)(1)(A), permits a teacher to reveal a grade book to a substitute *without having to also show it to a parent.* Contrary to the School District's challenge, therefore, our interpretation of § 1232g(a)(4)(B)(i) does not render that subsection superfluous, but is, in fact, the only reasonable way to construe that provision.

This court must next resolve whether grades are also "maintained ... by a person acting for [an educational] agency or institution" at the more preliminary stage when one student simply writes the grade of a fellow student on homework and test papers. *Id.* § 1232g(a)(4)(A)(ii). The student's transmission of that recorded grade, when the teacher later receives that grade, is necessarily done to allow the teacher to use the grade in some fashion.[11] In so assisting the teacher, the correcting student becomes a "person acting for [an educational] agency or institution." *Id.* The grade the correcting student places on the paper is also "maintained," because that student is preserving the grade until the time it is reported to the teacher for further use. In sum, the grades which students mark, at the teacher's direction, on each other's homework and test papers and later report to the teacher are "maintained ... by a person acting for [an educational] agency or institution." *Id.* This interpretation of FERPA is consistent with Congress' intent to protect from disclosure grades in a teacher's grade book. If Congress intended FERPA to preclude a teacher from revealing to one student the grades of another when written in a grade book, it would be incongruous to permit a teacher to disclose or allow the dissemination of those grades to other students immediately before recording them in the grade book or noting them in some similar way which serves the same purposes as a grade book record.

In its petition for rehearing, the School District argues, for the first time, that two provisions within FERPA, 20 U.S.C. §§ 1232g(a)(2), 1232g(b)(4)(A), undermine our statutory interpretation. This court is first unconvinced that in resolving whether

---

11. The teacher might use the grade by recording it in a grade book to calculate the student's final grade. Even if the homework or test grade never figures into the student's final grade, the teacher must still receive the grade to use it for some other purpose, perhaps to preserve, in a grade book or otherwise, a yardstick of each student's performance and progress to better develop effective teaching strategies.

particular documents constitute education records within the meaning of FERPA, we need to look beyond the statutory definition for the term "education records" when that definitional section provides a clear answer. Moreover, this court disagrees with the School District that these two provisions demonstrate congressional intent to exclude student-graded work from the definition of "education records."

■■■■ Section 1232g(a)(2) states that educational institutions must provide parents "an opportunity for a hearing ... to challenge the content of ... education records." The School District asserts that Congress could not have reasonably intended to allow parents to challenge in a hearing the accuracy of a grade placed on a student's homework or test by another student. The School District, relying on a statement from the legislative history, contends Congress only meant to afford parents a procedural right to challenge "institutional records."

To the contrary, Congress could have sensibly intended to provide parents a means to challenge the accuracy of grades on individual homework and test papers. Indeed, a challenge to "institutional records" such as a semester grade might necessarily require an investigation into the accuracy of the individual homework and test grades used to calculate the final semester grade. Moreover, the notion that a parent should have a right to raise such a challenge is neither beyond the pale of possible congressional intent, nor does it "trivialize" such intent, as the School District asserts. Imagine a student who, perhaps out of juvenile malice, consistently records grades on another student's pa-

pers which are lower than that which the student actually earned. Such inaccurate student grading could significantly impact the slighted student's more permanent grades. In such a situation, a parent has a definite and strong need to challenge the accuracy of the student-recorded grades. Under this court's view, FERPA provides the necessary recourse. Reading § 1232g(a)(2) on its face, therefore, does not, as the School District contends, illuminate the meaning of the term "education records." ·

■■■■ As to the legislative history noted by the School District, this court need not test those murky waters because we conclude the statutory language defining "education records" is clear on its face. It is because expressions in legislative history often lack the precision and clarity which we expect from the language of enacted statutes that this court generally does not look to such history when construing a statute unless the statutory language itself is ambiguous. *See United States v. Ron Pair Enters.*, 489 U.S. 235, 241–42, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Starzynski v. Sequoia Forest Indus.*, 72 F.3d 816, 820 (10th Cir.1995). Even if this court were to consider legislative history, we are unconvinced that the cited reference to "institutional records" demonstrates a clear congressional intent to limit the meaning of "education records" to "centralized, cumulative records." The enacted definition of "education records" within FERPA makes no reference to "institutional," "centralized," or "cumulative" records. *See* 20 U.S.C. § 1232g(a)(4).

■■■■ Finally, this court disagrees that § 1232g(b)(4)(A)[12] vitiates our statutory

12. Section 1232g(b)(4)(A) provides,

Each educational agency or institution shall maintain a record, kept with the education records of each student, which will indicate all individuals ..., agencies, or organizations which have requested or obtained access to a student's education records maintained by such educational agency or institution, and which will indicate specifically the legitimate interest that each

such person, agency, or organization has in obtaining this information. Such a record of access shall be available only to parents, to the school official and his assistants who are responsible for the custody of such records, and to persons or organizations authorized in, and under the conditions of, clauses (A) and (C) of paragraph (1) as a means of auditing the operation of the system.

construction. The School District asserts that this provision, in light of our conclusion that the term "education records" encompasses student-recorded grades which are provided to the teacher, would require *individual teachers* to maintain a record (an "access record") indicating every individual or entity which has requested or obtained access to the student's graded homework or tests and identifying that person's or entity's interest in accessing the student's education records. Such a requirement, the School District contends, runs contrary to Congress' intent expressed in § 1232g(b)(4)(A) to allow a central custodian to maintain such access records. This argument is unavailing, however, because nothing in this court's interpretation of the term "education records" would prohibit a central custodian from maintaining these access records, as the School District seems to fear.

In sum, because a reading of the plain language of FERPA demonstrates that the term "education records" encompasses the grades at issue in the instant case, this court concludes the district court erred when it resolved that the grading practice did not offend FERPA.[13]

### D. Qualified Immunity

▮▮▮▮ In their cross-motion for summary judgment, the individual defendants

20 U.S.C. § 1232g(b)(4)(A).

**13.** The School District justifies the grading of homework and tests by other students on two grounds: (1) it allows immediate feedback to the students; and (2) it relieves the teacher of the time-consuming task of correcting the papers. FERPA, however, forbids neither the practice nor the benefits. The statute does not prohibit students from correcting papers if done anonymously or with the consent of parents. *See* 20 U.S.C. § 1232g(b)(1). Furthermore, the evidence establishes that not all teachers have their students grade one another's work. As a consequence, there necessarily exist further alternatives to the practice of having students correct other students' papers without parental consent or anonymity. In its petition for rehearing, the School District itself recognized two additional techniques which teachers may employ to avoid liabili-

argued they are entitled to qualified immunity. Despite ruling that the grading practice violated neither the Fourteenth Amendment nor FERPA, the district court concluded that qualified immunity does not protect the individual defendants because "the rights of privacy under FERPA and the Fourteenth Amendment were clearly established at the time of the alleged violations." On appeal, the individual defendants contend the district court's qualified immunity ruling was erroneous and that qualified immunity provides an alternative basis to affirm the district court's summary judgment ruling in favor of those individuals. Contrary to Falvo's assertion that this issue is not properly before this court because the individual defendants failed to file a cross-appeal, this court may affirm the district court's ruling on any basis supported by the record. *See Schalk v. Gallemore*, 906 F.2d 491, 498 (10th Cir. 1990) ("Because we may affirm the trial court's decision on any grounds supported in the record, we proceed to consider the qualified immunity defense.").

▮▮▮ When a public official raises a qualified immunity defense in a § 1983 lawsuit, the plaintiff bears the burden of establishing (1) "that the defendant's actions violated a federal constitutional or statutory right," and (2) "that the right violated was clearly established at the

ty—collecting and passing out papers themselves or placing graded papers in sealed envelopes. There are still other means by which teachers can continue to work efficiently and effectively without violating FERPA. For example, if a teacher would like one student to collect from the others self-graded papers, the teacher can simply direct the students to turn their papers over so the grade is not revealed. Similarly, if a teacher does not wish to personally hand out graded papers, the teacher may have the students come to retrieve the papers one at a time, so they do not see each others' grades; alternatively, the teacher could fold over the papers to conceal the students' grades but not their names and thus allow a student to hand back the papers. The School District's protestations that this opinion somehow marks the end of the world for teachers, therefore, are far exaggerated.

time of the conduct at issue." *Horstkoetter v. Department of Pub. Safety,* 159 F.3d 1265, 1277, 1278 (10th Cir.1998) (quotation omitted). Having concluded that the grading practice violates FERPA, this court must further determine whether Falvo has demonstrated that the right she and her children enjoy under FERPA was clearly established at the time the individual defendants permitted the grading practice.

██ ] A right is "clearly established" when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "Although a plaintiff need not show that the very action in question was previously held unlawful, she must demonstrate that there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Horstkoetter,* 159 F.3d at 1278 (quotation and citation omitted). Falvo has presented no case law whatsoever which concludes that FERPA creates a right to prevent the disclosure of homework, test, or similar grades, nor is this court aware of any such legal authority. Moreover, although this court does not deem the Rooker letter or declaration to be persuasive, the FPCO's statutory interpretation contained in those documents suggests that the right which we elucidate today was not clearly established. The individual defendants are thus entitled to qualified immunity in the instant suit.[14] Because the qualified immunity doctrine only protects these individual defendants from liability for monetary damages and not from injunctive remedies, however, Falvo may pursue a claim for injunctive relief against these individual defendants in their official capacities. *See Jones v. City & County of Denver,* 854 F.2d 1206, 1208 n. 2 (10th Cir.1988); *DeVargas v. Mason & Hanger–Silas Mason Co.,* 844 F.2d 714, 718 (10th Cir.1988).

## IV. CONCLUSION

Because the grading practice which Falvo challenges does not implicate a Fourteenth Amendment right, this court **AFFIRMS** the District Court for the Northern District of Oklahoma's grant of summary judgment in favor of all defendants on the Fourteenth Amendment claim. Nevertheless, that grading practice does violate FERPA, and we thus **REVERSE** the district court's grant of summary judgment in favor of the School District on Falvo's FERPA claim.[15]

14. We recognize the existence of authority, albeit not in this Circuit, which holds that qualified immunity is unavailable to a defendant who violates a right arising from an unambiguous statute. *See Jackson v. Rapps,* 947 F.2d 332, 339 (8th Cir.1991). That rule does not apply in the instant case, however, because prior to this court's construing FERPA and concluding it unambiguously prohibits the grading practice, the very agency charged with administering that statute, the FPCO, had put forward a directly contrary interpretation. *See* 20 U.S.C. § 1232g(f), (g) (designating to the Secretary of Education the authority to enforce and address violations of FERPA and to establish a review board to investigate, process, review, and adjudicate such violations); 34 C.F.R. § 99.60(b) ("The Secretary [of Education] designates the [FPCO] ... to: (1) Investigate, Process, and review complaints and violations under [FER-

PA] and this part; and (2) Provide technical assistance to ensure compliance with [FER-PA] and this part."). We cannot expect educators to more accurately interpret a law than that law's administering agency; educators should be able to rely on the FPCO's opinions, in the absence of already existing, conflicting case law, regarding permissible practices under FERPA. To apply the rule set out by the Eighth Circuit in *Jackson* in the instant case, therefore, would undermine the purpose of qualified immunity, which aims to protect all but the objectively unreasonable. *See Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

15. The School District, however, will only be liable if Falvo can demonstrate "that the [illegal] actions of an employee were representative of an official policy or custom of [the School District], or were carried out by an

1220

On the basis of qualified immunity, this court also **AFFIRMS** the grant of summary judgment in favor of the individual defendants on Falvo's FERPA claim for monetary relief. Because qualified immunity does not protect the individual defendants from liability for injunctive relief, however, we **REVERSE** the district court's grant of summary judgment in favor of the individual defendants on Falvo's FERPA claim for injunctive relief. This court **REMANDS** for further proceedings consistent with this opinion.

official with final policy making authority with respect to the challenged action."

*Seamons v. Snow,* 206 F.3d 1021, 1028 (10th Cir.2000).